UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CHERA ANN SIMPSON                    :    CASE NO.  3:02CV1471(MRK)
      PLAINTIFF,

VS.

PATRICIA DENARDO, NEIL
O'LEARY, EDWARD D.
FLAHERTY, DAVID BALNIS,
DETECTIVE ROBLES, AND
MARK DEAL,
      DEFENDANTS.                    :    OCTOBER 23, 2003


## LOCAL RULE 56(a) 1 STATEMENT

1.    On April 21, 2001, plaintiff went to the Brass Mill

Mall in Waterbury, Connecticut.  Upon her arrival at the mall,

plaintiff observed a car parked in a handicapped zone.

Plaintiff did not call the police.  Instead, plaintiff decided

to confront the operator of the car (hereinafter Denardo)

concerning her parking.[1]  Exhibit A, pages 161-162, Exhibit B,

Exhibit C, Exhibit D, Exhibit E and Exhibit K.

2.    The interaction escalated to the point where

plaintiff claimed Denardo swore at her, scratched her, bit her

and grabbed her face.  Denardo claimed that the plaintiff

---

[1] Denardo is a co-defendant in this matter and is represented by separate counsel.

SACK, SPECTOR AND KARSTEN, LLP • ATTORNEYS AT LAW
836 FARMINGTON AVE • WEST HARTFORD, CT 06119-1544 • (860) 233-8251 • JURIS NO. 52776

drover her car and cut in front of her and her six-year-old granddaughter, swore at her in the presence of the granddaughter, threatened to have her (Denardo) arrested, scratched her and blocked her car when she wanted to move it. Exhibit B, Exhibit C, Exhibit D and Exhibit H.

3.    Waterbury Police officer Barbara Alenckis arrived at the scene to investigate the incident. Officer Alenckis spoke to both the plaintiff and Ms. Denardo. Exhibit A, pages 57, 58, 61 and Exhibit E.

4.    Waterbury police officer, Lt. Mark Deal, overheard the call at the mall. Lt. Deal was in the area and proceeded to the mall to provide Officer Alenckis assistance if she needed it. Exhibit A, pages 57-58, 61 and Exhibit E.

5.    When he arrived, Lt. Deal spoke with Officer Alenckis and learned that the plaintiff and Denardo were making complaints about each other's conduct. Lt. Deal advised Officer Alenckis that the Detective Bureau of the Waterbury Police Department was available to assist her (Alenckis) with the interviews and follow-up investigation of the incident. Exhibit E.

SACK, SPECTOR AND KARSTEN, LLP • ATTORNEYS AT LAW
836 FARMINGTON AVE • WEST HARTFORD, CT 06119-1544 • (860) 233-8251 • JURIS NO. 52776

6.    Officer Alenckis advised the plaintiff and Denardo that they should go to the police department and make their complaint. Exhibit A, pages 57-58, 61, Exhibit B pages 20-23, 32, Exhibit E and Exhibit H.

7.    Plaintiff agreed to do so and proceeded to the Waterbury Police Department to complain about Denardo. Exhibit A, pages 57-58, 61 and Exhibit B pages 20-23.

8.    At the police department, plaintiff provided a sworn statement to Detective Robles about her interaction with Denardo. Exhibit A, pages 12-13, 62-69 and Exhibit H.

9.    Plaintiff's sworn statement was used as part of the basis for the arrest warrant application for Denardo's arrest. Exhibit D and Exhibit H.

10.    Detective Robles was not involved in any other aspect of the investigation, arrest or arrest booking process involving the plaintiff. Exhibit A, pages 68-71.

11.    The day following the incident, plaintiff telephoned Waterbury Detective O'Leary and requested that her friend, (William Lissandrello), who witnessed the event, be allowed an opportunity to provide a statement about the incident. Lt.

O'Leary agreed to accept the witness statement to be included in the investigation. Exhibit A, pages 75-77, 83 and Exhibit B.

12.    Efforts were made to resolve the incident between plaintiff and Denardo. Plaintiff agreed to drop her complaint if Denardo submitted to an HIV test. Despite being aware that Denardo would take an HIV test and that the subsequent test in fact revealed that Denardo was not HIV positive, plaintiff nonetheless pursued her complaint to have Denardo arrested. Exhibit A, pages 87-90, Exhibit B, page 27, Exhibit I pages 13-17, 26-29, and Exhibit K.

13.    Denardo filed a written complaint with the Waterbury Police Department regarding plaintiff's actions on April 21, 2001. Exhibit C and Exhibit D.

14.    Detective Balnis prepared arrest warrant applications for the plaintiff and Denardo. Exhibit D.

15.    Lt. O'Leary took Detective Balnis' oath regarding the arrest warrant application. Exhibit D.

SACK, SPECTOR AND KARSTEN, LLP • ATTORNEYS AT LAW
836 FARMINGTON AVE • WEST HARTFORD, CT 06119-1544 • (860) 233-8251 • JURIS NO. 52776

16. The state's attorney and Judge reviewed the warrants and signed them authorizing the arrest of both the plaintiff and Denardo on charges of Breach of Peace. Exhibit D.

17. During her deposition, plaintiff was unable to identify any portion of the arrest warrant that she claims was misleading or false and that were attributable to Officer Balnis or O'Leary. Exhibit A, pages 77-87.

18. On July 11, 2001, plaintiff turned herself in at the Waterbury Police Department. Plaintiff was processed at the police department and released on a written promise to appear.

19. None of the named defendants were present when plaintiff turned herself in and none of them were involved when plaintiff was processed for her arrest. Exhibit A, pages 71-72, 85, 87, 114 and Exhibit I, pages 19-25,36-37.

20. On September 10, 2002, the state's attorney requested that nolles be entered on the charges against the plaintiff and Denardo. The state's attorney refused to "waste the state's time in prosecuting" an incident that "snowballed into absolutely . . . irrational proportions." The state's attorney further described the plaintiff and Ms. Denardo's

actions as a "silly incident that got out of hand," and that if both individuals, both individuals, let me emphasize, were acting like adults and acting in an appropriate fashion, neither of them would have been arrested…"  Exhibit F.

21.  During the pendency of the criminal investigation and prosecution, plaintiff filed a complaint with the defendant, Chief of Police Edward Flaherty, regarding the manner the investigation was conducted.  Exhibit G and Exhibit J.

22.  Chief Flaherty ordered an internal affairs investigation into the numerous claims set forth in plaintiff's complaint.  Exhibit G and Exhibit J.

23.  The investigation was conducted and completed with no substantiation as to the plaintiff's claims.  Exhibit G and Exhibit J.

DEFENDANTS, Lt. Neil
O'Leary, Chief Edward D.
Flaherty, Det. David Balnis,
Det. Angel Robles, and Lt.
Mark Deal

By: _____

Christopher G. Arciero
Federal Bar No. ct09199
Sack, Spector & Karsten
836 Farmington Avenue
West Hartford, CT  06119
carciero@sackspec.com
Their Attorney

**SACK, SPECTOR AND KARSTEN, LLP** • *ATTORNEYS AT LAW*
836 FARMINGTON AVE•WEST HARTFORD, CT 06119-1544•(860) 233-8251•JURIS NO. 52776

## CERTIFICATION

This is to certify that a copy of the foregoing has been mailed, postage prepaid, this _23rd_ day of October, 2003 to the following counsel of record:

John R. Williams, Esquire
Williams & Pattis
51 Elm Street
New Haven, CT   06510


Raymond B. Rubens, Esquire
Rubens & Lazinger
295 Congress Street
P.O. Box 1555
Bridgeport, CT   06601-1555

_____
Christopher G. Arciero

SACK, SPECTOR AND KARSTEN, LLP • *ATTORNEYS AT LAW*
836 FARMINGTON AVE • WEST HARTFORD, CT 06119-1544 • (860) 233-8251 • JURIS NO. 52776

1              UNITED STATES DISTRICT COURT

2             DISTRICT OF CONNECTICUT

3

4

5     ------------------------------x
      CHERA ANN SIMPSON,                  :
6                    Plaintiff,           :  CIVIL ACTION
                                          :  3:02CV1471 (RNC)
7           vs.                           :
                                          :
8     PATRICIA DENARDO, NEIL O'LEARY,     :  May 2, 2003
      EDWARD D. FLAHERTY, DAVID BALNIS,   :
9     DETECTIVE ANGEL ROBLES and          :
      MARK DEAL,                          :
10                   Defendants.          :
      ------------------------------x

11

12

13         DEPOSITION OF CHERA ANN SIMPSON

14

15    Taken before Lee Ann Biancucci, LSR #224, RPR,
      a Court Reporter and Notary Public for the
16    State of Connecticut, pursuant to Re-Notice and
      the Federal Rules of Civil Procedure, at Sack,
17    Spector & Karsten, 836 Farmington Avenue, West
      Hartford, Connecticut, on May 2, 2003,
18    commencing at 2:50 p.m.

19

20

21

22

23         Tyszka Court Reporting Services
                189 Old Forge Road
24              Riverton, CT  06065
                  860.379.7955

25

```
 1    next to me because I assumed the matter was

 2    taken care of.

 3        Q    What happened next?

 4        A    Next thing, I turned back and I did not

 5    notice at the time but -- I knew at the time a

 6    car had pulled up, a black unmarked car, just a

 7    regular car, and it parked quite a ways away,

 8    and they motioned for the officer who was

 9    arresting Ms. Denardo.  She then left her there

10    and went to speak with whoever this person,

11    which I found out later was Lieutenant Deal,

12    she went to speak with that person.  They were

13    quite far away.  There was no way I could hear

14    anything they said.

15            But she did come back after, you know,

16    a good 10-minute, 15-minute conversation with

17    him.  She came back to my car and said, The

18    situation is changed.  We need you to go to the

19    police department to file a report if you want

20    to pursue this matter.

21        Q    What was your response to that?

22        A    I said we absolutely would, but I did

23    have questions.  I was confused.  I said to

24    her, I don't understand why would you, all of a

25    sudden, arrest -- tell her she was under arrest
```

Tyszka Court Reporting Services

1    and not arrest her?  And she really had no
2    explanation.  She said, You need to go file a
3    report.  That's what we did.  We went to the
4    police department and filed a report.
5        Q    Did you have any other conversation
6    with this officer?
7        A    No, not that I recall.
8        Q    Did you have any conversation with the
9    other officer you said who had arrived on the
10   scene in this black, unmarked car?
11       A    No, I didn't find out until, like, a
12   day later that's who it was.  I had no idea who
13   was in the car.  It was a plainclothes person.
14   You would never have known it was a police
15   officer.  He never identified himself or came
16   near us.  He parked a good ways away, maybe six
17   or seven car lengths away.
18       Q    You agreed, you accepted what the
19   officer had to tell you when you went down to
20   the police station to file the complaint?
21       A    I went down, yes, immediately.
22       Q    Did you ask that officer for any type
23   of medical attention at the time?
24       A    No.
25       Q    Well, did you tell that officer that

Tyszka Court Reporting Services

1    Q    But you subsequently have alleged in

2    your Complaint that he ordered Officer Alenckis

3    not to arrest Ms. Denardo.  I don't know what

4    forms the basis for that statement.

5    A    She told us that -- she said that the

6    arrest isn't going to take place, you know, you

7    need to go down to the police department.

8    Q    Did she say the arrest was not going to

9    take place at the scene, but she needed to file

10   the Complaint?

11   A    Yes.

12   Q    Did she ever lead you to believe there

13   was not going to be an arrest ever or that you

14   needed to go --

15   A    She didn't say either way.  She just

16   asked us to please go file a report at the

17   police department.

18   Q    Did you ever hear the officer --

19   Lieutenant Deal ever tell Officer Alenckis not

20   to arrest Ms. Denardo?

21   A    No.  I didn't even know who he was at

22   the time.

23   Q    Did Lieutenant Deal ever have any

24   verbal communication with you?

25   A    No.

Tyszka Court Reporting Services

1      Q    So you then left the scene where this

2    took place and you proceeded -- who drove?  Did

3    you drive?

4      A    Yes.

5      Q    You were okay to drive your car?

6      A    Yes.

7      Q    And drive it to the Waterbury police

8    station?

9      A    Yes.

10     Q    And Mr. Lissandrello accompanied you to

11   the station, correct?

12     A    Yes.

13     Q    Did you meet with either Lieutenant

14   Deal or the first officer who was there,

15   Officer Alenckis?

16     A    No.

17     Q    For the record, A-l-e-n-c-k-i-s.  There

18   is another officer you met with?

19     A    Yes.

20     Q    Do you know who that officer was?

21     A    Don't recall his name.

22     Q    What happened when you got to the

23   station?

24     A    Well, they took my complaint and then

25     --

Tyszka Court Reporting Services

1      Q      When you say they took your complaint,
2   what do you mean by that?
3      A      They asked me what happened and wrote
4   it down and had me sign it.
5      Q      They took your statement?
6      A      My statement, yes.
7      Q      You don't know who that officer is?
8      A      I don't recall, no.
9      Q      In your Complaint you allege that
10  officer was Officer Robles, R-o-b-l-e-s.  Does
11  that ring a bell?
12     A      I don't recall who the officer that
13  took the original complaint was with.  I spoke
14  with several officers at some point.  I don't
15  recall his name, no.
16     Q      What was your understanding as to what
17  was taking place or was going to take place as
18  a result of you making that complaint?
19     A      Well, I assumed that the person would
20  be arrested since that's what I was lead to
21  believe from the beginning.
22     Q      In fact, she was subsequently arrested,
23  correct?
24     A      Yes.
25     Q      I just want to deal with Lieutenant

Tyszka Court Reporting Services

```
 1          second?

 2

 3              (Conference between the

 4          witness and her counsel.)

 5

 6   BY MR. ARCIERO:

 7       Q    Again, just talking about Lieutenant

 8   Deal, what facts are you relying on in your

 9   cause of action against him?  I'm trying to

10   find out why you are suing Lieutenant Deal.

11              MS. DOYLE:  I'll object to the

12          form.

13   BY MR. ARCIERO:

14       Q    You can answer the question.

15       A    I explained everything to my attorney.

16   Whatever they wrote in the Complaint, you

17   really have to discuss with them.

18       Q    Have you had any other dealings with

19   Lieutenant Deal since April 21st, 2001?

20       A    No.  Was that the date of the

21   incident?

22       Q    That's correct.  The answer is still

23   no?

24       A    No.  Yes.

25       Q    Now, with respect to the officer that
```

Tyszka Court Reporting Services

1    took your statement at the police station, he

2    readily wrote down everything you said occurred

3    that day?

4         A    Yes.

5         Q    And you read the statement that he

6    prepared?

7         A    Yes.

8         Q    And you signed the statement that he

9    prepared?

10        A    Yes.

11        Q    Did you have any objection to what was

12   contained in that report?

13        A    No.

14        Q    Did you have any other dealings with

15   this officer, other than giving the statement

16   to him?

17        A    Not that I recall.

18        Q    What are your claims -- because you've

19   listed this officer who took your statement as

20   a Defendant in this matter, what claims are you

21   pursuing against this officer in regards to

22   this matter?

23        A    As I said, I explained everything to my

24   attorney.  I don't know the legalities of

25   everything.

Tyszka Court Reporting Services

1    Q    As you sit here now and being aware of

2    everything that's taken place, do you have any

3    problems with how that officer took your

4    statement and prepared his report.  Just that

5    officer, not anybody else.

6    A    Without reviewing the statement again,

7    I can't say.  I can't answer that question.

8    Q    Do you have any problems, again just

9    with respect to what Lieutenant Deal's

10   activities were in this whole incident; do you

11   have any problems with what he did?

12   A    Can you repeat that?

13   Q    Just with respect to Lieutenant Deal,

14   that's the gentleman who was driving the black

15   undercover car, do you have any problems with

16   the way -- what he did that particular day?

17   A    Again, I don't know how to answer that

18   question.

19   Q    Answer it the best you can.  You've

20   told me you've never spoken to him, you never

21   heard him say anything.  You told me that you

22   don't know if he told the officer not to arrest

23   Ms. Denardo.  Is there anything about what he

24   did or didn't do that concerns you?

25   A    I don't know.

Tyszka Court Reporting Services

1    Q    Are you aware, Miss Simpson, you've

2    brought allegations against a number of

3    officers?  I'm trying to find out what they did

4    that made them Defendants in a federal

5    lawsuit.

6         Do you know if Officer Robles was

7    involved in preparing the arrest warrant for

8    your arrest?

9    A    I don't know.

10   Q    Do you know if he was involved in

11   preparing the arrest warrant for Ms. Denardo's

12   arrest?

13   A    I don't know.

14   Q    Was Officer Robles involved the day you

15   were actually arrested and processed at the

16   Waterbury Police Department?

17   A    I don't know.

18   Q    Do you remember seeing him there?  You

19   saw him when he took your statement.  Do you

20   remember seeing him the day you came in to turn

21   yourself in?

22   A    I don't remember what he looks like.

23   Q    How about Lieutenant Deal, do you know

24   if he was present the day you were actually

25   arrested?

Tyszka Court Reporting Services

1      A      I was confused and upset that they

2    would refuse to take my witness statement the

3    day before.

4      Q      When you say confused that they

5    wouldn't take your witness statement, you are

6    talking about Mr. Lissandrello's?

7      A      Yes.

8      Q      Are you aware that the officer who took

9    your statement, did he address that concern at

10   the time?

11     A      Yes.  He said Mr. Lissandrello was a

12   biased witness.

13     Q      In fact, you were a friend and/or had

14   some type of relationship with Mr. Lissandrello

15   at the time?

16     A      Correct.

17     Q      Subsequent to that, the police did, in

18   fact, accept Mr. Lissandrello's statement,

19   correct?

20     A      Yes.

21     Q      And also formed part of the basis in

22   the arrest warrant application for Ms. Denardo,

23   isn't that correct?

24     A      I don't know.

25     Q      So you were concerned about this, and

Tyszka Court Reporting Services

1  that's what prompted you to call Lieutenant

2  O'Leary?

3      A    Yes.

4      Q    Tell me about that conversation.

5      A    He basically told me Mrs. Denardo was a

6  wonderful person and basically said that --

7  asked me if I would drop the charges.  I said,

8  No, I would not.  That was really all that

9  basically took place.  He asked me if I would

10 drop the charges.

11     Q    Isn't it true that he mentioned to you

12 that there is a possibility that Ms. Denardo

13 would be pursuing a claim against you for your

14 actions?

15     A    He didn't say that until about two

16 weeks later when I refused to drop the charges.

17     Q    He also addressed the issue about the

18 witness statement and did not tell you to have

19 Mr. Lissandrello send in his written statement?

20     A    Yes.  He said the police would not take

21 it but if I insisted, he could handle it

22 himself.

23     Q    Now, is there anything -- withdrawn.

24          You make a claim in your lawsuit that

25 there were -- quote, "that the affidavits in

Tyszka Court Reporting Services

1    the arrest warrant was," quote, "grossly

2    inaccurate and misleading in that it omitted,

3    misstated, and distorted material facts."

4         Do you attribute any of that

5    inaccurate, misleading, or misstatements to

6    Lieutenant O'Leary?

7         A    Yes.

8         Q    What parts of the warrant do you

9    attribute to being inaccurate or misleading or

10   distorted?

11        A    I would really have to see it in front

12   of me.

13        Q    I will give you a copy.

14        A    Thank you.

15        Q    I'm handing you a copy of the warrant

16   for your arrest that was provided to me through

17   your attorney.  Take your time.

18        A    As I go through -- should I make the

19   comments as I go through or wait until I finish

20   the whole thing?

21        Q    As you go through, you can -- if you

22   would specifically reference the portion of the

23   warrant.

24        A    It says, "She --" meaning myself,

25   "-- observed Denardo improperly park her

Tyszka Court Reporting Services

1  vehicle in an unmarked handicapped place." It

2  was not a marked handicapped parking space. It

3  was a wheelchair access area.

4      I did not instruct her to move her

5  vehicle. I simply let her know what the area

6  was designated for and that it was not meant

7  for vehicles.

8      It says "Simpson began yelling

9  profanities." There was never a profanity that

10  came out of my mouth.

11      She never placed her hand lightly on my

12  face and asked me not to use profanity. She

13  simply grabbed my face. There were never words

14  spoken at that point.

15      Q    Are you still on page 1 of the warrant?

16      A    Yes.

17          MS. DOYLE:  Third line from

18          what I guess would be the last

19          paragraph.

20  BY MR. ARCIERO:

21      Q    Why do you claim that to be an

22  inaccuracy on the part of O'Leary? Isn't that

23  statement or that paragraph referencing what

24  Denardo told the officer?

25      A    Yes, it is.

Tyszka Court Reporting Services

```
 1        Q    You're not disputing that O'Leary --
 2   withdrawn.
 3            You are not claiming that O'Leary
 4   distorted or was inaccurate?
 5        A    You are correct.  I'm mistaken.  I'm
 6   reading it improperly.
 7        Q    This is what Denardo is informing the
 8   officers about?
 9        A    You are correct.  I apologize.
10        Q    Again, I will get to Ms. Denardo's
11   position.  I just want to know what you think
12   was the -- an omission or inaccuracy or
13   distortion on the part of the police officer.
14
15            (Pause.)
16
17        A    The part in paragraph 4, it said that I
18   added the part, "Stop, Gramma, or you are going
19   to get arrested."  I did not add that.  I had
20   told them initially it was omitted and when I
21   realized it was omitted, that's when I asked
22   them to add it into the warrant.
23        Q    I'm sorry.  You are claiming you made
24   that statement to Officer Robles when you were
25   at the station on the 21st?
```

Tyszka Court Reporting Services

1    A    Yes.

2    Q    When I asked you if you read the

3    statement and the accuracy of it and you had no

4    problem with that statement, you signed it?

5    A    But I thought I was supposed to answer

6    a simple yes or no.  When I got home and read

7    it thoroughly, that's when I realized there was

8    some omissions after I signed it.  I went back

9    to correct them.  Do you understand what I

10    mean?  I went home when I calmed down.  I read

11    it to make sure it was correct and when I

12    realized there was inaccuracies, I called and

13    went back.

14    Q    Did you give a second statement, or did

15    you just go back and...

16    A    I just explained to them.

17    Q    You also gave a second statement to

18    another officer, is that true?

19    A    Yeah -- yes, to make the changes that I

20    realized when I had calmed down.

21    Q    Continue, please.

22

23         (Pause.)

24

25    A    You don't want me to comment on

Tyszka Court Reporting Services

```
 1    correct?
 2        A    Yes, because the police refused to take
 3    his statement.
 4        Q    That was addressed through Lieutenant
 5    O'Leary when you called him the next day, he
 6    allowed you to, if you wanted to pursue that,
 7    to bring in the statement from Mr.
 8    Lissandrello, correct?
 9        A    Yes.
10        Q    You can continue with the warrant,
11    please.
12        A    Most of this is Denardo's, so I won't
13    be commenting on this, obviously.
14        Q    If you'd just reference the paragraph.
15    Is that paragraph 6?
16        A    Yes.
17        Q    That goes on for, appears to be maybe a
18    page, almost covers three pages, not fully?
19        A    Correct.  Should I just ignore that
20    portion of it?
21        Q    Again, you're claiming they distorted
22    and they submitted inaccuracies in the
23    warrant.  Again, I think I want you to be
24    comfortable with what you are testifying to.
25        A    Okay.
```

Tyszka Court Reporting Services

1
2                    (Pause.)

3

4      A    I'm not sure how to respond because

5    this is more legal than I'm really familiar

6    with.  This seems like all Ms. Denardo, and I'm

7    to be commenting on hers?  It's difficult for

8    me to decipher legally what I am supposed to

9    comment on.  I'm a little confused at the

10   moment.

11     Q    I understand.  Again, you do know that

12   in the lawsuit you are suing a number of

13   officers that relates to a warrant that's in

14   front of you now, which I've asked you to read

15   where you claim that Officers Balnis and

16   O'Leary prepared this warrant with the actual

17   knowledge that it was grossly inaccurate and

18   misleading, that it contains misstatements and

19   distorted material facts.

20                    MS. DOYLE:  Is there a

21           question?

22   BY MR. ARCIERO:

23     Q    Yes.  My question to you is that I'm

24   asking you to identify what are the inaccurate,

25   misleading, grossly distorted facts in the

                Tyszka Court Reporting Services

85

1   warrant application, and you've identified what

2   you think are some as we are sitting here?

3       A    As I said, I don't feel I'm equipped to

4   deal with this because this is all from

5   Denardo, and I don't think I have the legal

6   ability to decipher exactly...

7       Q    Was Lieutenant O'Leary present when you

8   were arrested and processed at the Waterbury

9   police station after the warrant?

10      A    I don't think so.  I don't remember

11  what he looks like, either, I'm sorry.  I don't

12  think so.

13      Q    Did you have any other contact with

14  Lieutenant O'Leary other than the phone call

15  regarding this matter?

16      A    He called my home and after our

17  original conversation when I refused to drop

18  the charges, he called my home several days

19  later and told me that if I didn't, Ms. Denardo

20  would file charges against me.

21      Q    Do you know whether or not he -- what

22  was your response when he informed you that she

23  might be seeking charges for your arrest?

24      A    I told him I did nothing wrong, I

25  didn't take well to threats, and he should

Tyszka Court Reporting Services

```
1    really not contact me and do whatever he needed

2    to do.

3         Q    Did you know Lieutenant O'Leary before

4    this incident?

5         A    No.

6         Q    Who do you think was threatening you,

7    was it Ms. Denardo threatening you, and O'Leary

8    was just informing you that she was going to

9    press charges?

10        A    Lieutenant O'Leary was threatening me.

11        Q    Did you ever speak with Officer Balnis

12   about the case?

13        A    He was the person who wrote the arrest

14   warrant.

15        Q    Yes.

16        A    As I said, I don't remember the name of

17   the person I met with.  I really don't recall

18   the name of the person I met with.

19        Q    Again, like I asked you to go through

20   the warrant for O'Leary, if I asked you to look

21   through the same warrant, would you come to the

22   same areas you thought were the distortions or

23   inaccuracies if I asked you to review it

24   regarding Balnis' role in preparing the

25   warrant?
```

Tyszka Court Reporting Services

1      A    Can you repeat that?

2      Q    In your lawsuit, you claim that both

3  Balnis and O'Leary prepared the warrant

4  application inaccuracies, distorted facts and

5  misleading facts.  You went through it.  If I

6  asked you to go through it, would you pick out

7  anything differently in the warrant that you

8  would attribute to Officer Balnis who actually

9  wrote the warrant?

10     A    As I said, there is some legalities

11  there I just don't understand, so I would

12  rather not.

13     Q    Do you know if Officer Balnis was

14  present at the date you were arrested?

15     A    I don't know the man, so I'm not sure

16  what the name of the person is.

17     Q    During the course of this, from April

18  21st until the date you were arrested, were

19  there any efforts undertaken by anybody or on

20  behalf of anybody to try to resolve this to

21  have this not go to a point where there was

22  going to be arrests made?

23     A    Yes.

24     Q    What do you mean?  Tell me about that.

25     A    I was confused about what was going on,

Tyszka Court Reporting Services

88

1   and I called the courthouse and asked for

2   assistance, talked to a gentleman, I can't

3   think of his name, Pudgy Maia.  I asked if he

4   would assist me in resolving this because I had

5   fears about the police department's handling of

6   the matter.

7        Q    How did you want it resolved?

8        A    I wanted Ms. Denardo to submit to an

9   AIDS test.

10       Q    Isn't it true that Ms. Denardo did, in

11   fact, submit to an AIDS test?

12       A    I don't know.  Nothing has been given

13   to me.

14       Q    Were you aware that on June 25th, 2001,

15   the Waterbury Public Health Department issued a

16   letter saying that she was, in fact, tested

17   back on May 1st, 2001 and that the results of

18   the test were nonreactive for H.I.V.

19   antibodies?

20       A    It was never given to me.

21       Q    Were you aware of it at any time prior

22   to today?

23       A    Yes.

24       Q    This is the first time you've ever been

25   aware of that?

Tyszka Court Reporting Services

1    A    No.  It was mentioned to me, but it was

2    mentioned to me after the arrest took place,

3    but it was never verified, so I didn't really

4    think about it.  I didn't look into it.  It was

5    never verified.  There was no documentation

6    from what I was told.

7    Q    You were aware after you were arrested

8    that she was -- the results of her test were

9    negative?

10    A    No.  I was told that she had AIDS

11    testing by Lieutenant O'Leary and by other --

12    someone else, I can't recall who, but I was

13    never presented with the facts.  I said I want

14    it in writing so I can see for sure that I'm

15    protected.  It was never given to me in writing

16    by anyone.  So, no, I did not take someone's

17    word on something.

18    Q    That all took place after the arrest,

19    is that right, or before?  When did it take

20    place?

21    A    There was a point when Pudgy met with

22    me and Ms. Denardo where she agreed to take the

23    test prior to the arrest, but it was never

24    turned over to me.

25    Q    Did you agree that everything would be

Tyszka Court Reporting Services

1    dropped if she did submit to a test?

2        A    I did.

3        Q    This is a meeting that was arranged by

4    Pudgy?

5        A    Yes.

6        Q    That both you and Mr. --

7        A    And my attorney.

8        Q    Who was your attorney?

9        A    Attorney Avitabile.

10       Q    Whatever happened with that agreement?

11       A    I was told that she never had the test,

12   so I proceeded with the arrest.  It wasn't

13   until after I was told she had and no one was

14   able to give me the written documentation that

15   it happened, and I was not taking someone's

16   word for it, so I pursued the matter.

17       Q    What was your goal in pursuing the

18   matter?

19            MS. DOYLE:  Object to the

20            form.

21   BY MR. ARCIERO:

22       Q    What was the goal you had in mind?

23       A    I wanted to know that I was safe -- to

24   this day, I don't know that I'm safe that I

25   don't have AIDS, that -- I mean, this is a

Tyszka Court Reporting Services

1      A   No.

2      Q   Any of the named defendants in this action,

3 were any of them present the day you were actually

4 processed at the Waterbury Police Department?  And

5 again, I'll just name them for you:  Neil O'Leary, Ed

6 Flaherty, David Balnis, Angel Robles, or Lieutenant Mark

7 Deal.  Were any of those individuals present when you

8 were processed?

9      A   I don't know.  I would not recognize any of

10 them other than Lieutenant Deal -- O'Leary, excuse me --

11 and I did not see him.  The others I wouldn't recognize.

12 I don't even know who they are.

13      Q   Did there come a point in time when you

14 contacted Mrs. Denardo's place of work to talk about the

15 incident?

16      A   No.  I contacted her place of work to verify

17 whether the AIDS card she gave me was a patient card or

18 not.

19      Q   What did they tell you?

20      A   And I was told she was employed there.

21      Q   So you knew she wasn't a patient based on that

22 conversation?

23      A   Yes, that was -- we - that was over a month

24 probably after the incident.

25      Q   What conversation did you have with the person

1       A    Yes, they did.

2       Q    But the matron, the female matron never put

3 her hands inside any of your clothing, correct?

4       A    No.

5       Q    Is that correct?

6       A    That's correct.

7       Q    Okay.  Now, at some point you prepared a

8 letter to Chief Flaherty, correct?

9       A    Yes, I did.

10      Q    To look into the allegations of this whole

11 incident?

12      A    Yes, I did.

13      Q    Did Chief Flaherty initiate or have an

14 internal investigation initiated concerning this matter?

15      A    I don't know.  I received a letter saying they

16 found no wrongdoing, but I really don't know.  At the

17 time I wrote the letter, I was not aware of the

18 connection of what was going on until after the letter

19 was written.

20      Q    What connection are you referring to?

21      A    The fact that after the incident and after my

22 letter to the superintendent, at that point Detective

23 Deal's wife contacted Attorney Avitable's office

24 manager, tried to get personal information about me from

25 her.  When she refused and asked why it was so important

TYCZKA COURT REPORTING SERVICES

1    that they find out who I was, she was then told that

2    Detective Deal -- this was his aunt.  I did not know

3    that at the time that I made the initial complaint.

4         Q    So what's the claim you have regarding Chief

5    Flaherty involving the lawsuit?

6         A    You'd have to ask my attorney that question.

7         Q    So you have not come up with any basis why you

8    allowed Chief Flaherty to be named as a defendant in

9    this matter and you rely solely on what your attorneys

10   have yet to tell you what the basis is for their claims

11   against him?

12        A    Well, I certainly believe that in my

13   conversation with him he was inappropriate and did not

14   conduct a decent investigation.

15        Q    How was he inappropriate towards you in your

16   conversations with him?

17        A    When I spoke with him after I received the

18   letter saying there was no wrongdoing, I contacted him

19   after the letter and after the court case was resolved

20   and said I had new information that they had contacted

21   Attorney Avitable's office.  I told them what happened

22   and that they said that this woman was his aunt.  He

23   said he didn't care who he was -- who she was; that they

24   would do what they wanted anyway.  And that's what he

25   said to me.  And then he said, "This conversation is

TYSZKA COURT REPORTING SERVICES
(860) 379-7955