UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

COPY

```
* * * * * * * * * * * * * * * * * *
                                   *
CHERA ANN SIMPSON,                 *
            Plaintiff,             *
                                   * Civil Action No.
VS.                                * 3:02CV1471  (RNC)
                                   * October 3, 2003
PATRICIA DENARDO, NEIL O'LEARY,    *
EDWARD D. FLAHERTY, DAVID BALNIS,  *
DETECTIVE ROBLES and MARK DEAL,    *
            Defendants.            *
                                   *
* * * * * * * * * * * * * * * * * *
```

### DEPOSITION OF JOHN MAIA

Taken on behalf of the Defendants in the above-entitled

cause, before Patricia Tyszka, Registered Merit

Reporter, Notary Public, in and for the State of

Connecticut, on Friday, October 3, 2003, at 1:00 p.m.,

at the offices of Sack, Spector & Karsten, 836

Farmington Avenue, West Hartford, Connecticut, pursuant

to the Federal Rules of Civil Procedure.

*PATRICIA TYSZKA, LSR, RMR*
*COURT REPORTING SERVICES*
*189 Old Forge Road*
*West Hartland, Connecticut   06091*
*Phone/Fax (860) 379-7955*

1    reason, just let me know and I'll --

2         A    I'm a little hoarse.  This is not my regular

3    voice.

4         Q    Okay.  That won't be reflected on the

5    transcript.

6              What do you do for a job, Mr. Maia?

7         A    I'm an inspector for the state's attorney's

8    office in Waterbury.

9         Q    How long have you been employed with the

10   state's attorney's office?

11        A    Twelve years.  But I retired from the police

12   department, Waterbury Police Department 30 -- I did 30

13   years there.

14        Q    What is your job function with the state's

15   attorney's office?

16        A    I work in conjunction with our different

17   police departments in our area and we oversee other

18   departments, and we work along with the prosecutors

19   preparing the cases, contacting witnesses, police

20   officers, and et cetera.

21        Q    Are you also involved in some part of that job

22   function to try to resolve cases before they go to

23   trial?

24        A    Correct.

25        Q    When you are asked to try to resolve a case,

TYSZKA COURT REPORTING SERVICES
(860) 379-7955

1       Q   Is that a week or so after she was at the

2  police department?

3       A   It was after.  I wouldn't set a time, but I

4  know it was definitely after, and she wasn't satisfied

5  with that.

6       Q   If I told you that the warrant was signed by

7  the judge on July 6th of 2001, do you believe that the

8  letter that you saw directed to Mr. Connelly was before

9  July 6th of 2001?

10      A   Unless I saw it I wouldn't take a guess on

11  that.

12      Q   Do you have a copy of that letter with you?

13      A   No.

14      Q   Do you have a copy in your possession or in

15  your files?

16      A   I know that we have -- we keep copies of the

17  files:  Ms. Simpson's file where the case was dismissed,

18  we have files of Denardo where it was dismissed, and we

19  have -- we'll have a file with Ms. Simpson's complaint.

20      Q   When the letter came in to Mr. Connelly, did

21  you have a meeting with Mr. Connelly to discuss the

22  letter?  Not anything about the prosecution of the case,

23  but did you discuss Ms. Simpson's letter with

24  Mr. Connelly?

25      A   He gave me an assignment to look at -- you

1    know, to check it out and see.  And then I came back to

2    him and I explained to him -- at one time I explained to

3    him that after I talked to both parties involved in

4    question, she was more concerned, Simpson, of not making

5    a complaint; she would be satisfied to forget about this

6    case if Ms. Denardo took a AIDS test -- I remember that

7    clear in my mind -- because of a position that

8    Ms. Denardo had -- it's some kind of program that she --

9    someplace that she worked.  And she was more concerned

10   with that because with the altercation, somehow she was

11   scratched or something and she was concerned about that.

12        After talking to both parties, one agreed --

13   Denardo agreed to take a test, and then I think it

14   started brewing again when the test didn't come soon

15   enough or something like that.

16        Q    Now, did Mr. Connelly want you to try to

17   resolve the case or just --

18        A    No.  He --

19        Q    -- find out what it was all about?

20        A    -- don't -- he don't try to tell you to

21   resolve the case, he -- you want to talk to both parties

22   and evaluate everything, and if you feel that the

23   Waterbury Police Department was wrong or anything, you

24   would notify Connelly, say, well, this is where -- after

25   evaluating everything and investigating, I feel this

1    shouldn't have been done or that shouldn't have been

2    done.

3        Q    And after you got the complaint from

4    Mr. Connelly and looked into it, did you ever report

5    back to Mr. Connelly about problems involving the

6    Waterbury Police Department or the officers who

7    investigated --

8        A    No.

9        Q    So everything was done --

10       A    I explained to Mr. Connelly that both parties

11   would be satisfied with resolving this matter and that I

12   even had an appointment with Simpson's attorney for 5:00

13   o'clock one of the nights when I got off work when we

14   went to Grand Street.  And what I did, I didn't even get

15   involved.  I stayed downstairs, let Attorney Avitable

16   which was -- that was his client, Ms. Simpson.  And at

17   one point I waited around I guess it was about a half an

18   hour or something.

19           I don't know what Ms. Denardo did or what

20   Ms. Simpson did up in that office of Louis Avitable's,

21   but when they came downstairs I thought it was a happy

22   ending.  They hugged each other and I felt that, hey,

23   maybe everything -- and I let Connelly know about that.

24   I said I think we're all set with this matter here.

25       Q    Now, did you ever discuss with Mr. Connelly

1    the complaint she had specifically about the Waterbury

2    Police Department?

3        A    Yes.  I explained that she had a complaint

4    about the Waterbury Police Department, but the complaint

5    to me, through my experience, it was -- based on my

6    experience, someone, if I may say --

7                **THE WITNESS:**  (To Attorney Brooks) Should

8        I discuss it with you first before I say it?

9        I think I'll be all right saying it.

10       A    Bottom line, through my experience, if I was

11   in Ms. Simpson's position I would have contacted the

12   Waterbury Police Department or security.  I feel that

13   she initiated it by going over there and bothering

14   Ms. Denardo.  If she got a complaint, through my

15   experience, notify the police department or security.  I

16   think she initiated the whole thing.  All right?  And

17   then they're both older persons.  Both of them I could

18   recall that they never been arrested.  I think it was

19   very nice of them to allow a cooling-off period, through

20   my experience, and see if you could resolve this without

21   coming into court with both of these people that never

22   been arrested.  Everybody makes mistakes, no big deal.

23       I think the Waterbury Police Department did a

24   good job basically investigating it, and then when

25   nobody was satisfied, to apply for a warrant which is

1   the proper way.  They could use their own discretion,

2   through my own experience.

3          Bottom line, went through the process in

4   court.  She had a lawyer, Ms. Simpson.  No problems.  We

5   tried every way.  We tried this way and we tried that

6   way, we tried every way we possibly can to satisfy her.

7   Even went out of the way to bring her to her own

8   lawyer's office -- knowing my position, don't even go

9   upstairs -- and then see them both happy at the end.  I

10  think that was nice.  Then I hear about this and I say,

11  wow.

12         So that's my honest opinion, and through my

13  experience I feel that this is a waste of a lot of

14  people's time.

15  BY MR. ARCIERO:

16     Q    Have you ever reviewed the arrest warrants for

17  Ms. Simpson and Ms. Denardo?

18     A    Yeah, I did.

19     Q    At what point in time did you review the

20  warrants?

21     A    After they were made out.  Not right after.

22     Q    After they were signed or -- by the state's

23  attorney and by the judge or --

24     A    After it was in the file.  After it was

25  processed.

TYSZKA COURT REPORTING SERVICES
(860) 379-7955

1        Q    What does that mean?

2        A    Well, when you apply for a warrant, it's

3   signed by the prosecutor, then it's given to the judge.

4        Q    Right.

5        A    And I think -- yes, I got to say this, too,

6   even -- I went to this extent:  Because she didn't trust

7   the Waterbury Police Department, Ms. Simpson, the day

8   that she had to be arrested with that warrant, I went to

9   the Waterbury Police Department with her.

10       Q    I'll get to that, but I want to know --

11       A    Okay.

12       Q    -- at what point in time you reviewed the

13  arrest warrant?

14       A    I couldn't tell you the exact time.  All I

15  know is that I looked at it.  I looked at it, but I knew

16  -- I didn't go like in detail because I already knew the

17  problem.  I really didn't have to reread the warrant.  I

18  knew the problem.

19       Q    Are you typically responsible to look at

20  warrants before they're signed?

21       A    I don't have to do that.  No, I don't -- the

22  prosecutors do that, not me.

23       Q    So you had no role as far as the decision --

24       A    No.

25       Q    -- to prosecute based on looking at the

1    warrant, you just looked at it as part of your process

2    to try to resolve it?

3        A    Right.  I try to see if we could resolve this

4    without getting to the court because both of them had

5    never been arrested, and it was the type of thing that

6    I've done in the past.

7        Q    Did you see any problems with the way the

8    warrants were prepared or the probable cause --

9        A    No, I didn't see no problem.

10       Q    Now, on the day that Ms. Simpson was arrested,

11   how did you learn that she was going to turn herself in

12   that day?

13       A    She contacted me.  She contacted me and I

14   went -- I met her at the police department.

15       Q    Now, did she call you or come to see --

16       A    Yeah, I believe -- I'm pretty sure she

17   contacted me and I said, well, what I'll do is I'll go

18   with you.  Because I saw they weren't satisfied anymore

19   and it went to this point that they both had a warrant

20   for them, so we tried to make it -- talking about me, I

21   contacted the police department, the desk officer,

22   people that's not even involved in this matter to treat

23   them both the same.  I think -- I'm almost sure they

24   both were PTA'd -- promise to appear -- which means, you

25   know, you don't have to pay no money or do anything and

1    then let the court handle.  That's when I got out of it.

2    I got out of that position I was in after that point.

3        Q    And why did you accompany her to the police

4    department?

5        A    Just because she was very nervous and scared

6    of -- you know, and I knew Louis.  I said, well, listen,

7    I'll go there with her just to keep her cool and see if

8    we could get -- based on me working there 30 years, I

9    went there and talked to the desk officer and explained

10   to them the situation -- both parties in question, not

11   taking any sides -- to see if we could get her in and

12   get her out, because based on the backgrounds of both of

13   them -- I didn't do a thorough background, but it seemed

14   like they're not criminals, it's just an incident that

15   occurred that couldn't have been -- couldn't have been

16   taken care of without getting to this point.

17        So right at that point she got served with

18   that warrant, and she went through the process of our

19   courthouse with her attorney.

20        Q    At the police station, did you see her get

21   processed?  What I mean by that is did you --

22        A    No, I didn't see every detail.  I think what

23   they do, they take a picture of her, they fingerprint

24   her, and then they have some paperwork to do to let her

25   know what day she has to be in court.

```
1       Q    Did you see her get fingerprinted?

2       A    I'm pretty sure that's the process of things.

3       Q    No.  Did you see her get --

4       A    No.  No.

5       Q    Did you see her get photographed?

6       A    No.

7       Q    Did you see her filling out any paperwork?

8       A    No.

9       Q    Did you see her get patted down or frisked

10  when she first --

11      A    No.

12      Q    Were you in the processing room when she was

13  processed or do you --

14      A    No.

15      Q    Now, she claims that you attempted to go in

16  there but you were asked to leave.  Did that happen?

17      A    No.

18      Q    That didn't happen?

19      A    No.

20      Q    She also claims that she was treated

21  differently than Ms. Denardo was treated when she was

22  arrested and processed at the police department.  Now,

23  did you see Mrs. Denardo get processed?

24      A    No.

25      Q    Were you present at the P.D. when Ms. Denardo
```

1    turned herself in?

2         A    I think I saw her in the hall.  I think they

3    both did it the same day, turned themselves in.

4         Q    Do you know if they were treated differently

5    in the way that they were processed that day?

6         A    No.

7                   MR. RUBENS:  What does that mean?  Does

8              that mean they weren't treated differently or

9              "no" you don't know?

10                  THE WITNESS:  I don't know.  No, I don't

11             know.

12   BY MR. ARCIERO:

13        Q    Okay.  Did Ms. Simpson ever tell you that she

14   was treated differently than Ms. Denardo?

15        A    She did mention that.

16        Q    What did she say?

17        A    I forget what she said.  She says something

18   that "they didn't treat me" -- and I just --

19        Q    Did she tell you how she wasn't treated --

20        A    No, she didn't get into any detail.  I can't

21   remember; I know that she was saying something.  But at

22   that point she got out, I knew she was satisfied.  And

23   when she hit me with something like that, "I wasn't

24   treated right," ba-boom, she said at some point when she

25   was outside.  And I said, well, it's in the court system

```
1     now, talk to your lawyer.  That's what I did.  I just

2     passed it on to her:  Talk to your attorney.  Talk to

3     Louis Avitable about this.

4          Q    And you waited for Ms. Simpson to be

5     processed?

6          A    I waited until she finished so she'd be out,

7     you know, to get in her car.  Even walked outside, I got

8     in my car and I took off.  I left after that.

9          Q    Okay.  You can't recall specifically what she

10    was complaining about the manner she was processed --

11         A    No.  No, not really; but I know she said

12    something to the effect that -- it was no -- it wasn't

13    nothing major.  I would have remem -- if it was

14    something -- they processed her.  I don't know.  I

15    wasn't there.

16         Q    Do you know whether or not Chief Flaherty was

17    present when she was processed?

18         A    I wasn't in the back, but I would take a

19    guess, though.  He wouldn't be there.

20         Q    How about Neil O'Leary?

21         A    No, he wouldn't -- no.  None of them would be

22    there that's on that list.

23         Q    Mark Deal wasn't there?

24         A    No.

25         Q    Angel Robles?
```

TYSZKA COURT REPORTING SERVICES
(860) 379-7955

1    A    Angel?  I don't know if he was a patrolman or

2    a detective.  And I didn't go in the back.  I wouldn't

3    say nothing about if he was there or not because

4    sometime they work as -- behind there.

5    Q    How about David Balnis?

6    A    He wasn't there.

7    Q    Did you talk to Ms. Denardo on the day that

8    she was arrested?

9    A    I think I just said hello or something to that

10   effect.

11   Q    Did she comment about the way she was

12   processed?

13   A    No.  She didn't say.

14   Q    Now, did Ms. Denardo contact you to tell you

15   that she was going to be turning herself in on the

16   warrant?

17   A    I think so.  I'm not sure.  I told them both,

18   and I tried to make it different times, something, so

19   they wouldn't --.

20   Q    Now, this decision to accompany Ms. Simpson to

21   the police department, that wasn't anything that was

22   normally what you would do, was it, in trying to resolve

23   cases?

24   A    That was my own decision based on talking to

25   both of them and it came to the point where they

1    couldn't resolve their matter.

2        Q    Did you ever tell Ms. Simpson that she was

3    treated differently than Ms. Denardo as far as the

4    processing took place?

5        A    Never said that.  No.

6        Q    Okay.  When I took Ms. Simpson's deposition,

7    she made a comment something to the effect that you told

8    her that the Waterbury Police Department would object to

9    any decision to have the charges dismissed.

10        A    Repeat that?

11        Q    Ms. Simpson said something to the effect that

12    you told her that the Waterbury Police Department would

13    object to any decision to have the charges dismissed

14    against her.

15        A    No.

16        Q    Never said that to her?

17        A    No.

18        Q    Did you ever talk to Ms. Simpson about the

19    decision to prosecute her?

20        A    In what respect?

21        Q    In any respect.  Did you ever talk to her

22    about comments or decisions or discussions you had with

23    Mr. Connelly about the decision to prosecute her?

24        A    No.

25        Q    Do you know if Ms. Simpson ever talked to

1  Mr. Connelly about the decision to prosecute her?

2      A    I don't believe she spoke to Connelly at all.

3      Q    Are you aware of anybody from the Waterbury

4  Police Department who tried to pressure you or

5  Ms. Simpson or Ms. Denardo regarding their decision to

6  go forward with the charges?

7      A    No.

8      Q    And did anybody from the Waterbury Police

9  Department talk to you to try to force you to influence

10  Ms. Simpson to drop the charges?

11      A    No.

12      Q    Were you present on the date that the charges

13  were nolled -- withdrawn.  Were you present the day that

14  the charges were disposed of regarding Ms. Simpson and

15  Ms. Denardo?

16      A    No.

17      Q    Were you aware of any discussions from any of

18  the attorneys representing Ms. Simpson or Ms. Denardo to

19  have the charges disposed of?

20      A    No.

21      Q    Now, there was a point in time I think you

22  mentioned earlier that you set up a meeting through

23  Attorney Avitable at some location on Grand Street?

24      A    Yeah.  His office upstairs.

25      Q    And who initiated that meeting or who wanted

1    to have this meeting take place?

2        A    Louis Avitable talked to me and I talked to

3    Louis.

4        Q    What was it that Louis said to you that

5    brought up this subject about having this meeting?

6        A    He looked over the -- what happened I guess,

7    Ms. Simpson talked to -- spoke to him; and after

8    evaluating it, he said maybe we could contact the other

9    party and I could talk to them, maybe they could resolve

10    this matter.  Neither one had been arrested before.

11        Q    And who brought up the idea that if

12    Ms. Denardo agreed to take a test to determine if she

13    was HIV positive and the results were negative, that

14    Ms. Simpson would withdraw her complaint?

15        A    She did, Ms. Simpson herself.  That's the

16    right name, Simpson?  Yeah.  She decided it.

17        Q    Were you present when she made this --

18        A    Yes.

19        Q    -- statement?

20        A    Yes.

21        Q    Did that take place at the meeting on Grand

22    Street?

23        A    That took -- she told me that

24    person-to-person.  Upstairs I didn't get involved.

25        Q    When she told you that person-to-person, was

1    that the same day that the meeting took place on Grand

2    Street?

3        A    She might have took it -- I'm not sure.  I

4    can't say, but I know she said it a few times, and at

5    one point she was -- wasn't satisfied because she didn't

6    get this documentation as of yet.

7        Q    Okay.  So when the meeting took place on Grand

8    Street, you didn't go upstairs with Ms. Simpson and

9    Ms. Denardo?

10        A    No.

11        Q    So who was at the meeting between -- to

12    discuss the rest --

13        A    Louis Avitable took care of that.  Attorney

14    Avitable.

15        Q    Was he present with Ms. Simpson and

16    Ms. Denardo?

17        A    Pretty sure.

18        Q    Have you learned what took place, what

19    discussions took place during that meeting?

20        A    All I know, when they came down they were --

21    embraced each other and it was a nice looking sight, and

22    I thought that was it.

23        Q    What was your understanding as to what took

24    place at the meeting?

25        A    I wasn't concerned.  That was the attorney's

1    business and I just left it alone.

2         Q    Okay.  So prior to that it was your

3    understanding that the deal that was being presented was

4    Ms. Denardo takes a test, it comes back negative,

5    Ms. Simpson withdraw --

6         A    Case closed.  It's all done.

7         Q    And when you saw them embrace after this

8    meeting at the Grand Street location, it was your belief

9    that they had reached an agreement?

10        A    Reached an agreement.

11        Q    Now, do you know what steps were taken to have

12   Ms. Denardo take the HIV test?

13        A    No.

14        Q    Do you know whether or not there was any

15   documentation or letter or anything that indicated that

16   she took a test and it was negative?

17        A    I think it was at a point that I heard or I

18   even observed it, that she took a test.  I'm not sure.

19        Q    Let me show you a document that was identified

20   as Defendants' 3 during Ms. Simpson's deposition.  Have

21   you seen that letter before?

22        A    (Reviewing.)  Something to this effect.  Yeah.

23        Q    And in this letter it indicates that

24   Ms. Denardo was tested for HIV on May 1st, and that the

25   results of the test were nonreactive?

```
 1        ask you about one aspect of what she says.

 2                 She tells me that -- this is in regards to the

 3        date she turned herself in at the Waterbury Police

 4        Department.  She said that:  Mr. Maia offered to meet me

 5        at the police station so the police did not come to my

 6        house to make it more difficult for me, as he thought

 7        would occur.

 8                 Did you ever have that conversation with her?

 9        A     No.

10        Q     She then goes on to say that you were asked to

11        leave and that she was searched in front of male

12        officers and put in a cell for a very long time.

13                 Are you aware of anything like that occurring?

14        A     Absolutely not.

15        Q     When she came out of the police station that

16        day, did she ever tell you that she was having trouble

17        breathing and that she was denied her medication?

18        A     No.

19        Q     Did she ever tell you that she was denied her

20        request to get medical help when she came out of the

21        police station that day?

22        A     No.

23        Q     Did she ever tell you that a female police

24        matron at the department informed her that if she were

25        to request medical help, the police matron would see to
```

1    it that she would be there much longer after she got out

2    of the hospital?

3        A    No.

4        Q    Did she ever tell you that when she came out

5    of the station that day she was arrested, that because

6    some medication had spilled in her purse that -- and if

7    she continued to ask questions of the police matron,

8    that she would be arrested again for not having her

9    medication properly marked and labeled?

10        A    No.

11        Q    Did anybody from the Waterbury Police

12    Department at any point in time ever influence any of

13    your decisions in regards to the conversations you had

14    with Ms. Simpson or Ms. Denardo?

15        A    No.

16        Q    And were you compelled in any way to try to

17    resolve this to the benefit of Ms. Simpson or

18    Ms. Denardo?

19        A    No.

20        Q    Were you surprised to learn that Ms. Simpson

21    was suing or brought a lawsuit against the five

22    Waterbury police officers who were involved in this

23    matter?

24        A    Yes.

25        Q    How many times did you talk with Ms. Simpson

  

**DEPARTMENT OF POLICE SERVICE**

CITY OF WATERBURY, CONNECTICUT 06702

**EDWARD D. FLAHERTY**
SUPERINTENDENT OF POLICE

October 15, 2001

Ms. Chera Ann Simpson
26 Midfield Drive
Apt. #17
Waterbury, CT  06704

Dear Ms. Simpson:

After reviewing your complaint received June 28, 2001 and the investigation conducted by the Waterbury Police Department, please be advised that your complaint cannot be substantiated.

Therefore, no further action will be taken.

Sincerely,

Edward D. Flaherty
Superintendent of Police

EDF:jc

cc: A.C.I. Bruce

**COPY**

United States District Court

District of Connecticut

CHERA ANN SIMPSON    :  Civil Action No. 302CV1471 RNC

           :

 Vs.         :

PATRICIA DENARDO, et al   :  NOVEMBER 22, 2002

## ANSWER OF DEFENDANT, PATRICIA DENARDO

1. The defendant denies paragraph 1. This defendant did not in any way conspire, falsely or maliciously have the plaintiff prosecuted. On April 21, 2001, it was explained to both the defendant and the plaintiff by the police that in any Breach of Peace, if there is an arrest that both parties are arrested. The plaintiff told the police and the defendant's employer (see enclosed letter) that she would drop the charges if the defendant would agree to be tested for HIV. The defendant agreed and on May 1, 2001 the test was done. The result proved to be negative for the HIV virus (see enclosed letter of results). The plaintiff then changed her mind and insisted the defendant be arrested. Hence, on July 11, 2001 both parties were arrested.

2. The defendant does not have sufficient knowledge of this paragraph.

3. The defendant does not have sufficient information of this paragraph.

4. The defendant is not the aunt or relative of Detective Deal nor does she have a relationship with any person in the Waterbury Police Department. The defendant did not dictate the arrest policies to officers of that department nor has the power to do so.

5. The defendant has insufficient information of this paragraph.

6. The defendant was arrested for Breach of Peace. The defendant did not ask to be arrested and did not ask for the plaintiff to be arrested and had no involvement in regard to the actions taken by the police department.

7. The defendant will attempt to clarify many false statements in Paragraph 7: On April 21, 2001, the defendant and her young companion were attempting to walk on the crosswalk at the JC Penney store at the Brass City Mall in Waterbury, when a car pulled in front of them blocking their way to the mall. A woman in the car asked if the defendant owned the car parked in the Handicapped parking area. The defendant told the woman that she had a Handicapped sticker and she wasn't going to be long in the Mall. The woman began to shout, "You move your car right now or I will have it towed." When the defendant refused to move her car, the woman threatened to have the car towed and the defendant arrested. The plaintiff then presented the defendant with a business card and indicated that she had the authority to do so. In an attempt to calm the woman down, the defendant gave her a business card and explained that she was a counselor. As the defendant was trying to calm the woman down, the plaintiff grabbed the defendant's hand and scratched the defendant's hand and herself at the same time. The plaintiff had very long nails and the defendant does not. To prove that the defendant did not scratch the plaintiff, she asked the police to scrape her fingernails. The plaintiff continued to shout and use profanity. As the defendant walked away, the plaintiff threatened, "You are going to jail."

8. The defendant left her young companion with a relative in the Mall and asked a security guard to please escort her to her car so she could move it because of fear of additional trouble. Approaching the defendant's car, they saw that the plaintiff's car was blocking the defendant's car and the plaintiff was still screaming. The security guard asked the plaintiff to move her car so the defendant could move. The plaintiff told him that he had no authority to tell her what to do and that she was waiting for the police to

come and have the defendant arrested. The defendant waited with the security guard for the police to arrive. All the while, the plaintiff was screaming hysterically that she was the Chairman for the Commission for Disabilities and she had the right to have people towed from Handicapped spaces. When the police arrived at the Mall, the plaintiff screamed to the officer to tow the car. The officer told the plaintiff that they couldn't tow the car because it had a Handicapped sticker. The defendant was not arrested for assault.

9. The defendant recalls defendant Officer Deal stopping at the scene.

10. The defendant does not have sufficient knowledge of this paragraph.

11. The defendant does not have sufficient knowledge of this paragraph.

12. The defendant does not have sufficient knowledge of this paragraph.

13. The defendant does not have sufficient knowledge of this paragraph.

14. The defendant does not have sufficient knowledge of this paragraph.

15. The defendant does not have sufficient knowledge of the plaintiff's experience with the police department after the issuance of the warrant because the defendant was not in the plaintiff's presence nor was the plaintiff present when the defendant turned herself in. When the defendant learned of the warrant for Breach of Peace, she voluntarily turned herself in to the Waterbury Police station and was arrested on July 11, 2001. The defendant was not intentional and malicious. During April and May, the plaintiff called the defendant's Program Director (refer to enclosed letter) and some colleagues telling them that the defendant assaulted the plaintiff by biting and scratching. The defendant has been working in the HIV/AIDS field for sixteen years both in private and community practice coordinating support groups for people living with or affected by the HIV/AIDS virus and involved with community awareness. The

3

defendant has received awards for her contributions to the community. The defendant, a sixty five year old wife, mother, grandmother and respected counselor suffers from stress and embarrassment from the false accusation by the plaintiff which resulted in an arrest and public notice appearing in the newspaper.

16. The defendant has no knowledge of this paragraph.

17. The defendant has no knowledge of this paragraph.

18. The plaintiff's accusations against the defendant were dismissed on or about September 10, 2001 by a Judge of the Superior Court.

19. The defendant did not tell the plaintiff that she was infected with the HIV virus. However, in order to placate the plaintiff, the defendant agreed to have an HIV test realizing that the law prohibits forced testing except under extreme measures. The plaintiff was not satisfied with the negative results printout. She insisted on a letter from the Clinic Director. The defendant complied with the plaintiff's requests in hopes to put all the emotional stress behind knowing that she did not cause any skin abrasions. The defendant requested the police to take a scraping of her fingernails. The police said that they only use that procedure in more serious cases. The defendant denies fault in paragraph 19.

20. The defendant denies fault in paragraph 20.

21. The defendant denies treating the plaintiff in any ill manner.

22. The defendant denies any malicious prosecution towards the plaintiff and disagrees with a judgment claim against her.

4

## DEFENDANT DENIES CLAIM FOR JUDGEMENT

THE DEFENDANT

*Patricia Denardo*

PATRICIA DENARDO
64 Dalton Street
Oakville, CT 06779
Home# 860-274-6813

Subscribed and Sworn to before me, a Notary
Public, in and for County of *New Haven*
and State of Connecticut, this *25th* day of
*November*, *2002*
.................................................
            Notary, Public
Date Commission Expires: *4/2005*

5



**WATERBURY PUBLIC HEALTH DEPARTMENT**
95 SCOVILL ST SUITE 100
WATERBURY, CT 06706
(203) 574-6780
FAX: (203) 597-3481

June 25, 2001

To Whom It May Concern:

Patricia Denardo Client ID# 0035249242 was tested on 5/1/01 for HIV antibodies.  The results of that test were non-reactive.  If you have further questions in regard to this matter please feel free to call me at (203) 574-6883.

Sincerely,

Joe Cote
Program Coordinator

JC/mc



# AIDS Ministries Program
# of Southern New England
### *An Ecumenical Ministry for All People*

TO: Patricia Denardo
FROM: Barbara Mase, Director, AIDS Ministries Program
Date: July 13, 2001
RE: April 21, 2001 incident

This memorandum will serve as information concerning the two telephone conversations with Chera Simpson of Waterbury in regard to an incident between herself and Patricia Denardo on the date of Saturday, April 21, 2001 in the parking lot of the Brass Mills Mall, Waterbury, Connecticut.

The first conversation with Ms. Simpson occurred more than one week following the incident of April 21. Ms. Simpson called to inform me of the apparent altercation which had occurred between herself and Mrs. Denardo regarding an apparent parking violation at the Brass Mills Mall. According to Ms. Simpson she had been physically accosted by Mrs. Denardo after she (Ms. Simpson) asked Mrs. Denardo to move her car, which according to Ms. Simpson was illegally parked in a handicapped area. According to Ms. Simpson, Mrs. Denardo became antagonistic to the point of actual punching, biting, scratching and twisting Ms. Simpson's face and person. Ms. Simpson, becoming aware of Mrs. Denardo's employment (Waterbury AIDS Outreach Ministries), then requested that Mrs. Denardo agree to a voluntary AIDS test because Ms. Simpson wanted to be assured that Mrs. Denardo was not HIV positive. In my conversation with Ms. Simpson I suggested that to my knowledge Mrs. Denardo was not HIV+, but Ms. Simpson pursued the urgent necessity of Mrs. Denardo being tested because of Ms. Simpson's own physical complications. Ms. Simpson expressed that if Mrs. Denardo agreed to a test and it was negative, that she would not pursue charges. However, according to Ms. Simpson, in the time following this incident, apparently Mrs. Denardo had refused such a test. I then assured Ms. Simpson that I did not have sufficient information pertaining to this incident to make any type of judgment or statement and would discuss this incident with Mrs. Denardo and be in touch with Ms. Simpson.

Following this first phone conversation with Ms. Simpson, I then called and spoke to Mrs. Denardo regarding the said incident. Mrs. Denardo presented me with her side of the altercation and also informed me that she had now agreed to an AIDS test and would be having such a test through the Health Department. Mrs. Denardo also informed me that she had gone to the Waterbury Police and made a statement concerning this incident. She also gave me the name of the detective assigned to the case for further referral (Detective Howard Jones).

Shortly after my phone conversation with Mrs. Denardo, I received a second phone call that same day from Ms. Simpson who informed me that the "deal was off." (The deal being if Mrs. Denardo agreed to a test and it was proven negative that she would not press charges.) I informed Ms. Simpson that I had spoken with Mrs. Denardo and that she had agreed to an AIDS test. Ms. Simpson now stated that she was going to press charges anyway, because Mrs. Denardo was apparently now trying to have Ms. Simpson removed from the Commission for Persons with Disabilities. At this point in the conversation I suggested to Ms. Simpson that the issue was now in the hands of the court, and that resolution would occur in a just and timely fashion. She agreed and our conversation ended.

All three of these phone conversations – the two with Ms. Simpson and the one with Mrs. Denardo occurred on the same day more than one week after the April 21 incident.

*A Program of the Salvation Army*

855 Asylum Avenue • Hartford, CT 06105 • Phone: (860) 543-8400 • Fax: (860) 808-9821