```
 1
 2                    UNITED STATES DISTRICT COURT
 3                      DISTRICT OF CONNECTICUT
                              **COPY**
 4   * * * * * * * * * * * * * * * * * *
                                        *
 5   CHERA ANN SIMPSON,                  *
                Plaintiff,               *
 6                                       *  Civil Action No.
     VS.                                 *  3:02CV1471 (RNC)
 7                                       *  September 9, 2003
     PATRICIA DENARDO, NEIL O'LEARY,     *
 8   EDWARD D. FLAHERTY, DAVID BALNIS,   *
     DETECTIVE ROBLES and MARK DEAL,     *
 9               Defendants.             *
                                         *
10   * * * * * * * * * * * * * * * * * *
11
12          DEPOSITION OF CHERA ANN SIMPSON - VOLUME II
13
14   Taken on behalf of the Defendants in the above-entitled
15   cause, before Patricia Tyszka, Registered Merit
16   Reporter, Notary Public, in and for the State of
17   Connecticut, on Tuesday, September 9, 2003, at 1:40
18   p.m., at the offices of Sack, Spector & Karsten, 836
19   Farmington Avenue, West Hartford, Connecticut, pursuant
20   to the Federal Rules of Civil Procedure.
21
22                   PATRICIA TYSZKA, LSR, RMR
                     COURT REPORTING SERVICES
23                        189 Old Forge Road
                   West Hartland, Connecticut  06091
24                 (860)379-7955  FAX (860)379-7955
25
```

```
 1    specifically say it would have to be the actual lab test
 2    itself and not a letter from anyone.  And no lab test
 3    was ever presented to me.  And Pudgy Maia certainly did
 4    not even present me with any type of letter.  He may
 5    have presented Attorney Avitable with it, I don't know;
 6    you'd have to speak to him about that.  Once I retained
 7    him, he handled everything.
 8        Q    What's your relationship with Pudgy Maia?
 9        A    I have no relationship.
10        Q    Or what was the relationship with Pudgy Maia?
11        A    Met him for the first time when this happened.
12        Q    How was it you happened to meet him?
13        A    I was very upset about the situation.  I knew
14    something was very, very wrong with the way the police
15    were handling it and threatening me, so I contacted the
16    courthouse and asked if someone could assist me in
17    trying to resolve this issue and to try to find out why
18    these calls were coming in and I was being asked so many
19    times that if I didn't drop the suit that they would
20    file a complaint against me.
21        Q    Who would file a complaint against you?
22        A    Lieutenant O'Leary called my home and asked
23    initially that I drop the charges.  When I refused, he
24    told me what a wonderful woman Mrs. Denardo was.  I
25    asked him how he knew her.  He said he didn't, he just
```

1   assumed that she was because he spoke with her.  I said
2   I would not drop the charges.
3           About a week later he asked me the same thing.
4   I still said I would not drop the charges without an
5   AIDS test.  At that point he said if I didn't drop the
6   charges he'd see to it that Mrs. Denardo filed a
7   complaint against me against breach of the peace.  That
8   was about seven days later, eight days later.  The
9   following day she went in and filed a complaint against
10  breach of the peace.  About seven days after my original
11  complaint, approximately.
12      Q   Say those exact words he told you?
13      A   He specifically said --
14      Q   He said to you that he would see to it that
15  Denardo would file charges against you?
16      A   Yes.
17      Q   So what happened when you met with Mr. Maia?
18  Tell me about that meeting, that first meeting that you
19  had with him.
20      A   It was outside of Louis Avitable's office.
21      Q   Who set the meeting up?
22      A   Mr. -- Attorney Avitable.
23      Q   This is after you called the court looking for
24  some assistance?
25      A   Initially I called the court looking for some

```
 1   made up that statement?
 2        A    I absolutely do.
 3        Q    Do you think that document I just presented to
 4   you that's been marked as Defendants' 3 is a total
 5   fabrication by Miss Barbara Mase, the director of the
 6   AIDS ministry program --
 7        A    I absolutely do.
 8        Q    So you think all the comments in here and her
 9   reference to the two conversations she had with you,
10   that Ms. Mase is lying?
11        A    I absolutely do.
12        Q    Okay.  Thank you.
13             Did you ever tell anybody at the police
14   station that Lieutenant O'Leary threatened to have you
15   removed from the commission that you were serving on?
16        A    Yes.  He did.
17        Q    And you also believe that Lieutenant O'Leary
18   threatened to have you arrested if you didn't drop the
19   charges against Mrs. Denardo?
20        A    He said he would have Mrs. Denardo have me
21   arrested.
22        Q    But last time at the deposition you told me
23   you felt that Lieutenant O'Leary was threatening you.
24        A    Yes, I did.  I take that as a threat.  If
25   someone calls and tells me if I don't drop the charges
```

```
 1        Q    And sometime in the early evening on that
 2   day -- which I understand was a Sunday?
 3        A    I don't recall.
 4        Q    Okay.  Doesn't make any difference.
 5        A    Yeah, okay.
 6        Q    You were going to the Brass City Mall?
 7        A    Yes.
 8        Q    What was the purpose of going to the Brass
 9   City Mall?
10        A    We were going to have a cup of coffee at the
11   Coffee Beanery.
12        Q    What was your relationship with
13   Mr. Lissandrello at that time?
14        A    He was my boyfriend.
15        Q    How long had you known him prior to that?
16   Approximately.
17        A    Oh, a lot of years.  His wife was a friend of
18   mine before she passed away.
19        Q    And after she passed away you continued your
20   friendship?
21        A    To be friends, yes.  Yes.
22        Q    As I understand, as you entered into the
23   parking lot of the mall -- and I've never been there so
24   it's hard for me -- you happened to look over and notice
25   a car parked where there are crossed lines --
```

Case 3:02-cv-01471-MRK   Document 41-3   Filed 11/24/2003   Page 6 of 19

154

1   A   Correct.
2   Q   -- for vans to park with disabled people so
3   that the wheelchairs could be let down; is that right?
4   A   Correct.
5   Q   And nobody was supposed to park in that area?
6   A   Correct.
7   Q   And you were aware of that?
8   A   Correct.
9   Q   And you were aware of that because you had a
10  permit to park in a handicapped parking area; is that
11  right?
12  A   No.  I was aware of it because at the time I
13  was chairman of the commission for disabilities, and
14  part of our job was to be aware of all the regulations
15  for handicapped vehicles.
16  Q   Let's go to that.  Chairman.  Now, was that a
17  paid job?
18  A   No, it's not.
19  Q   Who started this commission?  I mean, was
20  it --
21  A   It's been there forever.  I mean --
22  Q   Was it done by the city council or a city --
23  whatever they have in Waterbury that runs the city?
24  A   Yeah.  You're appointed by the mayor,
25  confirmed by the board of aldermen.

TYSZKA COURT REPORTING SERVICES
(860) 379-7955

1   Q   Okay. So this was something since you termed
2   yourself as being disabled, I assume, you felt
3   interested in to make sure that all these laws regarding
4   disabilities were followed; is that right?
5   A   Actually, no. I was asked by a member of the
6   commission if I would consider sitting on the
7   commission. She explained it to me. I said I would. I
8   was appointed, confirmed, and then about three months
9   later I was asked if -- it was voted on by the
10  commission and I was nominated as chairwoman.
11  Q   Okay. How long was that before this incident
12  occurred?
13  A   I was on the commission for about three years
14  when I resigned six months ago. So it was quite a
15  while, I guess. Quite a while before. I'm not sure the
16  exact number of years.
17  Q   How long was your term for?
18  A   It was three years, but because the positions
19  were not completely filled, the mayor asked that no one
20  vacate their commission and put an extension on all
21  commissions because of the city problems.
22  Q   So anyhow, you were very conscious of the
23  rights of disabled people?
24  A   Absolutely.
25  Q   Now, as I understand it, you saw a woman and a

```
 1    child exit that car that was parked in the improper
 2    place; is that what --
 3         A    Actually, that's not what happened.
 4         Q    Well, just tell me, was anybody sitting in the
 5    parked car when you saw it parked where it shouldn't
 6    have been parked?
 7         A    No.  They had -- no.
 8         Q    Okay.
 9         A    They had exited already.
10         Q    Did you notice the people had exited?
11         A    Yes, I did.
12         Q    Where were they at that point when you first
13    saw them?
14         A    They had exited and walked to the sidewalk of
15    the entrance of the mall.
16         Q    Okay.  So you saw them walking --
17         A    Mm-hmm.
18         Q    -- from the car to the mall, to the entrance
19    to the mall.  Is that right?
20         A    Correct.
21         Q    What did you do with your car at that point?
22         A    I parked my car and I rolled down the window
23    and I said --
24         Q    Wait a minute.  Before you go on, where did
25    you park your car?
```

1   A   At the exit -- at the entrance to the mall.

2   Q   At the entrance to the mall.  Did you impede
3   the progress of the car that was parked if somebody
4   tried to move it at that point?

5   A   No.  There were no cars when I pulled in front
6   of the mall.  The mall is just -- the parking places are
7   over here and the entrance is over here, so there's no
8   parking places in front of the entrance.  It's just like
9   a circle you just kind of pull up at.

10   Q   What I'm trying to find out is how close to
11   the parked car was your car?

12   A   It wasn't.  The only time I proceeded to
13   behind Mrs. Denardo's vehicle was to get her license
14   plate after the incident occurred and she refused to do
15   anything.

16   Q   You rolled down the window?

17   A   Yes.

18   Q   You didn't see this lady park the car?

19   A   Oh, yes, I did.  Oh, yes, I did.

20   Q   You saw that?

21   A   Yes.

22   Q   I thought you told me the first time you saw
23   them they were walking and they were going into the
24   entrance of the mall?

25   A   Sir, you asked me if I saw them exit the car.

1    I said yes, I did. You asked me if I approached someone
2    when they were in the car. I said no, I didn't. They
3    were not in the car when I spoke with them.
4         Q    I want to clear this up again because either
5    I'm getting stupid in my old age or what. Where were
6    they the first time you saw them, Mrs. Denardo and this
7    little girl?
8         A    They were parking their car. I was quite a
9    ways away. I saw them parking where they were parking.
10   They exited the car, they walked onto the sidewalk on
11   the entrance of the mall. At that point I was coming
12   around to where they were parked. Instead of going
13   around to where they were parked, I pulled up to the
14   sidewalk, rolled down my window and said nicely to the
15   woman, "Do you realize that that is reserved for
16   wheelchair access only?"
17        Q    You said it nicely?
18        A    Very nicely. I identified myself.
19        Q    We agree, you have all the politeness of a --
20   point is, did you have any police authority?
21        A    No. Absolutely not.
22        Q    Did you have a badge or anything?
23        A    Absolutely not. I simply had a business card
24   and asked her as a courtesy would she be a little more
25   considerate to other people.

1    Q    Is that what you did?

2    A    Absolutely.

3    Q    Why were you going to take her marker number?

4    A    Because she was starting swearing at us and
5    threatening us and acting very irrational and she really
6    made me nervous, and I turned to say to Richard there's
7    something wrong.  There might be some kind of issue
8    here, but we need to just take the plate and leave and
9    deal with this later through the commission or through
10   the police department because there is something very
11   wrong here.  She was just erratic.  It didn't even make
12   sense, her response.

13   Q    You were not erratic, but she was?

14   A    No --

15   Q    All right.

16   A    No.

17   Q    I want to understand how this all happened.
18   And she had a little -- how old would you say this child
19   was with her?

20   A    Oh, maybe six or seven.

21   Q    Six or seven.  And during this wild tirade of
22   hers, she just ignored her child?  The child --

23   A    The child was screaming.  The child was
24   screaming and crying and saying, "Grandma, grandma,
25   stop.  You're going to get arrested."  The child was

```
 1   hysterical.
 2        Q    Didn't the child get hysterical when you
 3   threatened to have the grandmother arrested?
 4        A    No.  I never threatened to have the
 5   grandmother arrested.
 6        Q    All right.  Now, you had to move your car, did
 7   you not, to get her marker number?
 8        A    Can I explain the way it took place?  After I
 9   had said something to her about the courtesy she should
10   extend to wheelchairs, she acted erratic.  I pulled
11   around the other side where she was parked, was writing
12   down her license plate number on a piece of paper.  What
13   happened is at that point she was still at the entrance
14   of the mall.  I did not realize she had run after my car
15   and came in through the window.  I thought she was still
16   at the sidewalk.  My head was turned, writing on a piece
17   of paper.  She had run with the child all the way to my
18   car which was maybe five cars away that was behind her
19   car, taking down the license plate number, and that's
20   when she came through the window and started grabbing
21   me.
22        Q    She couldn't come through the window unless
23   you had it down.
24        A    I did have it down.  It was --
25        Q    When you saw her, did you try to put your
```

1   window up?
2         A    I absolutely did try to put it up, but I
3   couldn't get her out of the car. I was attempting with
4   a seat belt on to get her out of the car. She had her
5   entire head in my car, sir.
6         Q    Couldn't you have just driven on and --
7   question withdrawn. You're aware they had guards around
8   there, do they not, at that mall?
9         A    I got on the phone and called immediately. We
10  called the police. That's the first thing we did.
11        Q    Did you call the police before the altercation
12  or after the altercation?
13        A    The minute she came after me we got on the
14  cell --
15        Q    I want to know whether or not you ever called
16  the police to report the car was illegally parked --
17        A    No.
18        Q    -- before anybody --
19        A    No.
20        Q    You just decided you were going to take the
21  marker plate down?
22        A    And deal with it later, yes.
23        Q    You had no legal authority to do that other
24  than to report this incident to somebody in authority --
25        A    Right.

Case 3:02-cv-01471-MRK   Document 41-3   Filed 11/24/2003   Page 14 of 19

162

1  Q  -- is that right?
2  A  Correct.
3  Q  And now your testimony is that as you moved
4  your car -- and was your car directly to the rear of her
5  car?
6  A  Yes.
7  Q  Okay. So if she got into her car and backed
8  up she would have hit your car?
9  A  Yes.
10 Q  And you did that deliberately to block that
11 car, to keep it from moving; isn't that right?
12 A  Certainly not. It was not deliberate because
13 she wasn't in the car, sir. We were taking a license
14 plate down and we were going to proceed on. We thought
15 she was already in the mall.
16 Q  Couldn't you take the license plate by parking
17 alongside of her and leaving free --
18 A  There was no place alongside of her, sir. She
19 squeezed her car in two three-foot access areas which
20 were not meant -- the person with the handicapped van on
21 one side could not even get in his car because she was
22 so close, nor could the other person. There was no
23 possible way to park next to her.
24 Q  Now, then you had this altercation that
25 happened that you described interminably. How long does

TYSZKA COURT REPORTING SERVICES
(860) 379-7955

```
 1    he went to the police and he gave his own statement,
 2    that's between you and him.  I was not there.  I did not
 3    go with him.
 4         Q    I've got nothing to do with it.
 5         A    Well, I can't respond.  I did not go with him.
 6    I was not there.
 7         Q    You didn't prepare that statement that was in
 8    the police record?
 9         A    I did not prepare any statement.  I assisted
10    Richard -- when the police refused to take our
11    statement, I had said, you know, there's really
12    something wrong with that, and I insisted they take his
13    statement.  At that point we sat down and wrote things
14    out together.  Not me.  Together.  But at that point he
15    said, "I'm going to go to the police station," which he
16    did and he spoke to an officer there.  I was not present
17    at the time, I cannot comment on it.
18         Q    Now, you also claim that Mrs. Denardo
19    conspired with the police officers.  When did this
20    conspiracy take place that you allege in your complaint?
21         A    Well, I allege that at the time the police
22    officer, Officer Lundquist (phonetic) arrived, she was
23    about to put Mrs. Denardo under arrest.  She had the
24    handcuffs in her hand to put on.  In the interim of her
25    telling Mrs. Denardo prior to putting the handcuffs on
```

```
 1    that she needed to get out of her car, a call came
 2    over -- she was on a cell phone in her car.  A call came
 3    over the police radio of Officer Lundquist that I could
 4    clearly hear, that said another call is coming in
 5    requesting Detective Deal at the Waterbury incident.  So
 6    it was obvious that Mrs. Denardo was calling on her cell
 7    phone to get Detective Deal there.  When he came, he did
 8    not identify himself and certainly didn't say he was
 9    related or knew the woman in any way.
10         Q    Have you got any evidence that Mrs. Denardo is
11    related to either Lieutenant Deal or Mrs. Deal?
12         A    The only evidence I have is his wife --
13    Detective Deal's wife's phone call to Attorney
14    Avitable's law firm saying that they were related.
15         Q    That's your evidence?
16         A    Yeah.  Yes.
17         Q    I want to make sure.
18         A    Yes.
19         Q    Okay.  Did you check any birth records, family
20    records or anything else to establish this relationship
21    between Mrs. Deal and Mrs. Denardo?
22         A    I had no reason to.  I fully believe that
23    Attorney Avitable's office wouldn't lie to me about her
24    saying something like that.
25         Q    Okay.  That's fine.  Now, what is it you're
```

1   claiming that Mrs. Denardo said on her cell phone?
2       A    I don't know what she said. I know that a
3   call came in requesting Detective Deal at the scene when
4   the police officer was screaming for Mrs. Denardo to get
5   out of the car or they would break in. She had locked
6   herself in the car making this cell phone call.
7       Q    You don't know who the call was being made
8   to --
9       A    No. I assumed it must have been the police
10  because --
11      Q    Don't assume. Do you know? Do you know --
12      A    For a fact? No.
13      Q    -- as a matter of fact?
14      A    No.
15      Q    Do you know as a matter of fact that at that
16  point Mrs. Denardo was talking to anybody in the
17  Waterbury Police Department?
18      A    By fact? No.
19      Q    Okay. Now, what other evidence do you have
20  that Mrs. Denardo conspired with the Waterbury Police
21  Department against you?
22      A    Well, she went down there several times, did
23  not file a complaint against me, but -- let me finish,
24  please -- but she had Lieutenant O'Leary call me in her
25  presence to tell me what a wonderful person she was,

1   which I thought was very unusual for a police matter to
2   be handled that way.  I asked Lieutenant O'Leary why
3   Mrs. Denardo was such a wonderful person and he
4   certainly didn't take the time to get to know me and
5   tell her what a wonderful person I was.  That struck me
6   as very, very unusual, yes.
7        Q    Maybe he didn't think you were so wonderful.
8        A    He didn't know me.  How could he make that
9   judgment?  He certainly seemed to know her.
10       Q    Did the Waterbury Police Department arrest
11  Mrs. Denardo?
12       A    Yes.
13       Q    Did they arrest her as a result of your
14  complaint against her?
15       A    Yes, after I refused to drop the charges after
16  I was asked for an entire week.  They did not even
17  submit my arrest warrant on the day it was signed and
18  submitted.  They waited.
19       Q    Ms. Simpson, did the Waterbury Police
20  Department arrest Mrs. Denardo as a result of your
21  complaint against her?
22       A    Yes.
23       Q    Did Mrs. Denardo appear in court as a result
24  of your complaint?
25       A    I did not see her in court.  I saw her at

```
 1
 2                          CERTIFICATE
 3
 4     STATE OF CONNECTICUT  )
                             )    ss: West Hartland, Connecticut
 5     COUNTY OF HARTFORD    )
 6          I, Patricia Tyszka, a Notary Public duly
       commissioned and qualified in and for the County of
 7     Hartford, State of Connecticut, do hereby certify that
       pursuant to notice there came before me on the 9th day
 8     of September, 2003, at 1:40 p.m., the following named
       person, to wit: CHERA ANN SIMPSON, who was by me duly
 9     sworn to testify to the truth and nothing but the truth
       of his knowledge touching and concerning the matters in
10     controversy in this cause; and that she was thereupon
       carefully examined upon her oath and her testimony
11     reduced to writing under my direction; that the
       deposition is a true record of the testimony given by
12     the witness; that the deposition may be signed before a
       Notary Public.
13
            I further certify that I am neither attorney nor
14     counsel for, nor related to, nor employed by any of the
       parties to the action in which this deposition is taken,
15     and further that I am not a relative or employee of any
       attorney or counsel employed by the parties hereto or
16     financially interested in the action.

17     In witness whereof I have hereunto set my hand and
       affixed my notarial seal this 26th day of
18     September, 2003.

19
                                  /s/ Patricia Tyszka
20                                _____
                                  Patricia Tyszka, LSR, RMR
21                                Notary Public
                                  License No. 00046
22
                                  My commission expires
23                                May 31, 2005
24
25
```

TYSZKA COURT REPORTING SERVICES
(860) 379-7955