**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CHERA ANN SIMPSON | : |
| | : |
| v. | :   NO. 3:02CV1471(MRK) |
| | : |
| PATRICIA DENARDO, | : |
| NEIL O'LEARY, EDWARD D. | : |
| FLAHERTY, DAVID BALNIS, | : |
| DETECTIVE ROBLES and | : |
| MARK DEAL | : |

**<u>MEMORANDUM OF DECISION</u>**

Battling for a parking space at the mall can often be a frustrating experience, one made all the more frustrating when one believes (rightly or wrongly) that another shopper is using a handicap parking spot she is not entitled to use. One might expect rising blood pressure or even a few intemperate remarks in such a situation. Regrettably, in this case, those frustrations escalated into arrests for breach of the peace and this lawsuit.

Plaintiff Chera Ann Simpson has sued Patricia Denardo and Waterbury Police Officers Neil O'Leary, Edward D. Flaherty, David Balnis, Angel Robles, and Mark Deal under 42 U.S.C. § 1983 for false arrest and malicious prosecution in violation of the Fourth Amendment and for depriving her of equal protection of the laws in violation of the Fourteenth Amendment. Compl. [doc. # 1] ¶ 1. Pending before the Court are Motions for Summary Judgment by the Waterbury Police Officers [doc #33] and by Ms. Denardo [doc. #36]. As explained below, the Court GRANTS both Motions for Summary Judgment [docs. ##33, 36].

## I.

Unless otherwise indicated, the following facts are undisputed, and all ambiguities are construed in favor of Ms. Simpson.[1]  On or about April 21, 2001, Ms. DeNardo, accompanied by her six year-old granddaughter, drove to the Brass Mill Mall in Waterbury, Connecticut.  Officers Statement ¶ 1; DeNardo Statement ¶¶ 1, 2; Simpson Statement ¶ 1.  Ms. DeNardo, who was 64 years old at the time, parked her car, to which was affixed a handicapped parking permit, in the loading-unloading area of the mall which was designated for wheelchair-bound persons.  DeNardo Statement ¶ 3; Simpson Statement ¶ 1.  While seated in her own car, Ms. Simpson saw the location of Ms. DeNardo's car, and as Ms. DeNardo started to cross the parking area, Ms. Simpson told Ms. DeNardo she should not be parking in a loading-unloading area.  DeNardo Statement ¶ 4; Simpson Statement, Section II, ¶ 4.

Ms. DeNardo then approached Ms. Simpson, who was seated in her car, to discuss the matter.  DeNardo Statement ¶ 5; Simpson Letter to Superintendent Flaherty [doc. # 35], Ex. G, at 1.  An argument ensued, and, in response to a 911 call by Ms. Simpson, Waterbury Police Officer Barbara Alenckis went to the mall to investigate the incident.  DeNardo Statement ¶ 6; Officers Statement ¶ 3; Simpson Statement ¶ 6.  Waterbury Police Officer Mark Deal overheard the call

---

[1] The facts are derived from the Police Officers' Local Rule 56(a)1 Statement [doc. #35] ("Officers Statement"), Ms. DeNardo's Local Rule 56(a)1 Statement [doc. #38] ("DeNardo Statement"), Ms. Simpson's Consolidated Local Rule 56(a)2 Report [doc. #41] ("Simpson Statement"); and the Deposition of Chera Ann Simpson [doc. # 35], Ex. A ("Simpson Depo.").

The parties filed the following pleadings: Defendant Officers' Memorandum of Law in Support of Defendants' Motion for Summary Judgment [doc. #34] ("Officers' Mem. in Supp. of Mot. for Summ. J."); Memorandum of Law in Support of Defendant Patricia DeNardo's Motion for Summary Judgment [doc. #37] ("DeNardo's Mem. in Supp. of Mot. for Summ. J."); Plaintiff's Consolidated Brief in Opposition to Motions for Summary Judgment [doc. #42] ("Mem. in Opp'n to Mots. for Summ. J."); and Correction to Motion for Summary Judgment [doc. #43].

about the incident at the mall on his police radio, and he also drove to the mall. Officers Statement ¶ 4; Simpson Statement ¶ 4.

Officer Alenckis was in the process of arresting Ms. DeNardo when Officer Deal, in an unmarked car, called Officer Alenckis over to his car. Simpson Depo. at 57. After Officers Deal and Alenckis spoke for about 15minutes, Officer Alenckis told Ms. Simpson that she should go to the Waterbury Police Headquarters to file a report if she wished to pursue the matter further. Officers Statement ¶ 6; Simpson Statement ¶ 6; Simpson Depo. at 57. Ms. Simpson complied and proceeded to the Waterbury Police Department to file a complaint against Ms. DeNardo. Officers Statement ¶ 7; Simpson Statement ¶ 7.

Ms. Simpson gave a sworn statement to Detective Robles about the incident. Officers Statement ¶¶ 8, 9; Simpson Statement ¶¶ 8, 9. At the time, Detective Robles declined to accept a statement from Richard Lissandrello, a friend of Ms. Simpson who had witnessed the events, due to the potential for bias on Mr. Lissandrello's part. Simpson Depo. at 76. The next day, however, Ms. Simpson spoke on the phone with Officer O'Leary and asked that Mr. Lissandrello be permitted to provide a statement about the incident. Officers Statement ¶ 11; Simpson Statement ¶ 11. Detective O'Leary told Ms. Simpson that he was doubtful that the Police Department would accept Mr. Lissadrello's statement, but since Ms. Simpson insisted, Officer O'Leary said he would handle it himself. Simpson Depo. at 77. Later, the police did, in fact, accept Mr. Lissandrello's statement. Simpson Depo. at 76; Deposition of Richard Lissandrello [doc. # 35], Ex. B, at 22.

On or about the same day, Ms. DeNardo filed a written complaint with the Waterbury Police Department against Ms. Simpson. Officers Statement ¶ 13; Simpson Statement ¶ 13.

Detective Balnis prepared arrest warrant applications for both Ms. Simpson and Ms. DeNardo on charges of breach of peace on the basis of the statements that had been provided to the police. It is undisputed that the applications prepared by Detective Balnis were reviewed and ultimately signed by both the State's Attorney and a Judge of the Connecticut Superior Court. Officers Statement ¶¶ 14, 16; Simpson Statement ¶¶ 14, 16.

In a letter to Chief of Police Edward Flaherty two months later, Ms. Simpson complained about the police investigation into the April 21, 2001 mall incident. Officers Statement ¶ 21; Simpson Statement ¶ 21; Simpson Letter [doc. # 35], Ex. G. On the basis of Ms. Simpson's letter, Chief Flaherty ordered Internal Affairs to look into Ms. Simpson's complaints that the police department had treated Ms. Simpson unfairly and had given Ms. DeNardo lenient and preferential treatment. *See* Simpson Letter at 1; *see also* Note to Internal Investigations [doc. # 35], Ex. G. Following an investigation, an Internal Affairs Report rejected Ms. Simpson's claims and concluded that proper procedures had been followed.[2] Waterbury Police Department Internal

---

[2] The Internal Affairs Report stated that

> Based on the review of the statements, warrant affidavits and interviews with the involved Officers, it is apparent that proper Police procedures were followed.
> Ms. Simpson has provided what seem to be her delusional perspectives of the incident that occurred . . . Ms. Simpson initially encountered the other female (Ms. DeNardo) by showing her identification that she was a Commissioner on a city board. This suggests that she may have misused her official positions as a Commissioner in the City in an attempt to enforce what she believed to be a parking violation. This was a factor that provoked the encounter between Ms. Simpson and Ms. DeNardo. Ms. Simpson should have simply notified the Police to report what she perceived to be any violation of the law.
> Based on the information obtained it is apparent that the Police followed proper procedures and that the complaint cannot be sustained.

Waterbury Police Department Internal Affairs Report [doc. #35], Ex. J, at 3

Affairs Report [doc. #35], Ex. J, at 3; Simpson Statement ¶ 23.

On or about July 11, 2001, Ms. Simpson turned herself in at the Waterbury Police Department, where she was processed and released on a written promise to appear in court. Officers Statement ¶ 18; Simpson Statement ¶ 18.  None of the Defendants was present when Ms. Simpson turned herself in, and none of them was involved in processing Ms. Simpson for her arrest for breach of peace.  Officers Statement ¶ 19; Simpson Statement ¶ 19.  On September 10, 2002, Assistant State's Attorney Corinne Klatt asked Superior Court Judge Richard A. Damiani to enter pleas of *nolle prosequi* on the charges against both Ms. Simpson and Ms. DeNardo.  Officers Statement ¶ 20; Simpson Statement ¶ 20; Superior Court Transcript [doc. # 35], Ex. F, at 3.  Neither Ms. Simpson nor Ms. DeNardo objected to the prosecutor's request, and the Court nolled the charges. This lawsuit followed.

## II.

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(b).  A genuine issue of fact exists when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome if the substantive law renders them so.  *Andersen v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).  The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986).  If the moving party carries its burden, the party opposing summary judgment "may not rest upon mere allegations or denials," rather the opposing party must "set forth specific facts showing that there is a genuine issue for trial."  Fed.

R. Civ. P. 56(e).  The Court must draw all ambiguities and inferences in favor of the plaintiffs. *See Andersen*, 477 U.S. at 255.  However, to defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Andersen,* 477 U.S. at 249-50.

### III.

Defendants raise two threshold issues: whether Ms. DeNardo can be considered a state actor for the purposes of §1983; and whether certain of the named police officers who lacked any personal involvement in the alleged constitutional violation can be subject to liability under §1983.

### A.

"Section 1983 authorizes a court to grant relief when a party's constitutional rights have been violated by a state or local official or other person acting under color of state law." *Washington v. County of Rockland*, 373 F.3d 310, 315 (2d Cir. 2004) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)).  This Court has recently considered the state action doctrine as applied to a private actor in a § 1983 case in *Szekeres v. Schaeffer*, 304 F. Supp. 2d 296, 304-05 (D. Conn. 2003), and the Court directs the parties to that decision for the applicable law.

It is undisputed that Ms. DeNardo was not employed by any Federal, State, or local government agency at any relevant time.  Affidavit of Patricia DeNardo [doc. #36], Ex. D, ¶ 14. Rather, she was employed by the Salvation Army's AIDS Ministry Program, and she was paid by the Salvation Army.  *Id.* ¶ 13.

Since Ms. DeNardo was a private party otherwise beyond the reach of § 1983, Ms. Simpson premises her claims of § 1983 liability against Ms. DeNardo on two alternative theories. First, Ms. Simpson alleges that Ms. DeNardo is the aunt of Defendant Police Officer O'Leary and asserts that Ms. DeNardo's close relationship to Officer O'Leary transformed Ms. DeNardo into a state actor empowered to dictate the decisions made by the Waterbury Police Department. Compl. ¶ 4.  According to Ms. Simpson, the sole basis for her belief that Ms. DeNardo and Officer O'Leary are related is an alleged call by Officer Deal's wife to Louis Avitable's law firm[3] in which Officer Deal's wife allegedly stated that Ms. DeNardo and Officer O'Leary were related. Simpson Depo. at 173.  Officer O'Leary denies any family relationship to Ms. DeNardo.  *See* Defendants' Response to Plaintiff's Requests to Admit, Dated September 16, 2003 [doc. #36], Ex. F, ¶¶ 1, 2.

"[C]onduct that is ostensibly private can be fairly attributable to the state only if there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Tancredi v. Metro. Life Ins. Co.*, 316 F.3d 308, 313 (2d Cir. 2003) (internal quotations omitted); *see Brentwood Acad. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).  There is no admissible evidence of any family relationship between Officer O'Leary and Ms. DeNardo, and therefore no basis on which the Court can find or even infer one.  More importantly, the record contains no evidence whatsoever that Ms. DeNardo had, or exercised, any influence over decision making by the Waterbury Police Department, whether or not she was related to Officer O'Leary.  After all, Ms. DeNardo was also

---

[3] Attorney Avitable represented Ms. Simpson during the criminal proceedings against her for breach of peace.  *See* Superior Court Transcript [doc. #35] Ex. F, at 2.

7

arrested on charges of breach of peace as a result of this incident.  *See* Superior Court Transcript [doc. # 35], Ex. F, at 3.  Ms. Simpson has provided no evidence from which a reasonable jury could infer a close nexus between Ms. DeNardo and Officer O'Leary, or anyone else in the Waterbury Police Department.

In the alternative, Ms. Simpson posits that Ms. DeNardo is subject to § 1983 liability on the basis of an alleged conspiracy between Ms. DeNardo and Officers O'Leary and Balnis.  Ms. Simpson bases her § 1983 conspiracy theory on the following alleged facts: Officer O'Leary described Ms. DeNardo as a wonderful person and attempted to persuade Ms. Simpson to drop her assault charges against Ms. DeNardo, Simpson Depo. at 77; Officer Alenckis was in the process of arresting Ms. DeNardo for assault but then changed her mind upon conferring with Officer Deal when he arrived on the scene, Simpson Depo. at 57-8; Ms. Simpson observed Ms. DeNardo use her cell phone following Officer Deal's arrival on the scene, Simpson Depo. at 174; Ms. Simpson was directed to report to police headquarters if she wished to file charges against Ms. DeNardo, *id*. at 15.; and Officer O'Leary asked Ms. Simpson not to pursue charges, but stated that if she insisted on pressing charges, Ms. DeNardo would likewise file charges against Ms. Simpson.  Simpson Depo. at 77.

The Court outlined the applicable law regarding § 1983 conspiracies in *Sullivan v. Stein*, No. 3:03CV1203 (MRK), 2004 WL 1179351, at *11 (D. Conn. May 21, 2004), and the parties are directed to that decision for the applicable law.  To state a claim against a private entity on a section 1983 conspiracy theory, the plaintiff must allege facts demonstrating "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."  *Ciambriello v. County of*

8

*Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002). Conclusory, vague or general allegations of a conspiracy are insufficient as a matter of law. *Id*.

This is a standard that Ms. Simpson's evidence simply does not satisfy. There is no evidence of an agreement, tacit or otherwise, between the Officers and Ms. DeNardo to deprive Ms. Simpson of her constitutional rights. While Ms. Simpson imagines that Ms. DeNardo spoke with Officer Deal from her cell phone at the time of the incident and exercised some influence on him to convince Officer Alenckis not to arrest Ms. DeNardo, Ms. Simpson admitted at her deposition that she did not know to whom Ms. DeNardo placed the cell phone call, and that she did not know for a fact that Ms. DeNardo contacted the Waterbury Police Department. *See* Simpson Depo. at 61. Moreover, Ms. DeNardo was ultimately charged with breach of peace after Ms. Simpson went the police headquarters and pursued her charges against Ms. DeNardo.

"A private party involved in a conspiracy with state actors can be liable under § 1983, but to sustain such a claim, the plaintiff must allege facts showing an agreement or meeting of the minds between the state actor and private actor to engage in a conspiracy to deprive the plaintiff of a constitutional right." *Colon v. Town of West Hartford*, No. 3:00 CV 168 (AHN), 2001 WL 45464, at *7 (D. Conn. Jan. 5, 2001). Beyond rank speculation and conclusory allegations of a conspiracy, Ms. Simpson presents no evidence to suggest that there was a meeting of minds between any member of the Waterbury Police Department and Ms. DeNardo to deprive Ms. Simpson of her constitutional rights. Moreover, Ms. Simpson's admission that the Waterbury Police Department eventually arrested Ms. DeNardo for breach of peace as a result of Ms. Simpson's complaint against her undermines Ms. Simpson's claim that Ms. DeNardo colluded with the Waterbury police. *See* Simpson Depo. at 63, 175. Because Ms. Simpson has failed to

9

raise a triable issue, via either a close nexus to or a civil conspiracy with a state actor, regarding whether Ms. DeNardo is subject to § 1983 liability, Ms. DeNardo is entitled to summary judgment.[4]

## B.

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).  Although Ms. Simpson names Superintendent Flaherty and Officers Deal and Robles as defendants in this action, she has not provided any evidence from which a reasonable trier of fact could conclude that any of these officers were personally involved in the alleged wrongful acts. Accordingly, Defendants Deal, Flaherty, and Robles are entitled to summary judgment.

In her deposition testimony, Ms. Simpson was asked, "Any of the named defendants in this action, were any of them present the day you were actually processed at the Waterbury Police Department?  And again, I'll just name them for you: Neil O'Leary, Ed Flaherty, David Balnis, Angel Robles, or Lieutenant Mark Deal.  Were any of those individuals present when you were processed?"  Mr. Simpson replied, "I don't know. I would not recognize any of them other than Lieutenant Deal – O'Leary, excuse me – and I did not see him.  The others I wouldn't recognize. I don't even know who they are."  Simpson Depo. at 114.

---

[4] Ms. Simpson argues for the first time in her brief in opposition to Ms. DeNardo's motion for summary judgment that Ms. DeNardo "is liable to plaintiff for common law assault and battery."  Mem. in Opp'n to Mots. for Summ. J. at 11.  The Complaint, however, fails to include state law claims of assault and battery against Ms. DeNardo, and her attempt to raise them in this case at this stage is untimely.

Officer Deal's connection to this dispute is tenuous at best.  Ms. Simpson refers to Officer Deal in a written complaint she submitted to Superintendent Flaherty.  She states, "Just as [Officer Alenckis] was placing [Ms. DeNardo] under arrest a black sedan pulled up and motioned for the Officer.  They spoke for quite a whole and then the Officer came back and asked me and my friend to go to the police station and that a Detective would be waiting to take our statement.  I found out the next day, the man in the black sedan was Detective Deal of your department.  We went to the police station . . . The next day I complained to Lt. O'Leary who told me he would handle everything and Detective Deal was off the case."  Simpson Letter [doc. # 35], at 1-2.  At her deposition, Ms. Simpson admitted that she never spoke with Officer Deal, Simpson Depo. at 61, and she was unable to articulate any factual basis for attributing unlawful conduct to Officer Deal, simply stating that the facts were "whatever [my attorneys] wrote in the Complaint, you really have to discuss with them."  *Id.* at 68, 70.  When asked whether she had any interactions with Officer Deal since April 21, 2001, the date of the incident at the mall, Ms. Simpson repeated that she had not.  *Id.*

Since Ms. Simpson effectively conceded that there is no basis to allege unlawful conduct by Officer Deal, the Court concludes that there is no genuine issue of material fact as to Officer Deal's personal involvement in any alleged constitutional deprivation against Ms. Simpson.  No reasonable trier of fact could find a basis for liability against Officer Deal.  Consequently, the Court grants Officer Deal summary judgment on all claims.

Ms. Simpson also names Officer Robles as a defendant but, as with Officer Deal, she was unable to state any facts that implicate Officer Robles in any unconstitutional conduct.  *Id.* at 71.  The deposition testimony of Ms. Simpson contains the following exchange:

11

Q: Do you know if Officer Robles was involved in preparing the arrest warrant for your arrest?
A: I don't know.
          . . .
Q: Was Officer Robles involved the day you were actually arrested and processed at the Waterbury Police Department?
A: I don't know.
Q: Do you remember seeing him there? You saw him when he took your statement. Do you remember seeing him the day you came in to turn yourself in?
A: I don't remember what he looks like.

*Id.* It appears to the Court that Officer Robles' sole involvement in this matter is that he took Ms. Simpson's statement at police headquarters. Since Ms. Simpson is unable to articulate the basis for her claim that Officer Robles violated her constitutional rights, the Court finds that no reasonable trier of fact could find that Officer Robles was personally involved in any alleged violation of Ms. Simpson's constitutional rights. The Court therefore grants Officer Robles summary judgment on all counts.

The record further fails to demonstrate the personal involvement of Superintendent Flaherty in any unconstitutional conduct. The single source of Ms. Simpson's grievance against Superintendent Flaherty is her claim that the Waterbury Police Department failed to conduct a proper investigation into her complaints regarding the April 21, 2001 incident. Simpson Depo. at 133. Ms. Simpson submitted a letter, dated June 23, 2001, addressed to Superintendent Flaherty recounting the events of that day and her dissatisfaction with how her case was handled. *See* Simpson Letter [doc. # 35], Ex. G. On July 6, 2001, Superintendent Flaherty notified Internal Affairs of Ms. Simpson's complaints, and requested that they investigate the matter. *See* Notice from Superintendent Flaherty [doc. # 35], Ex. G. On or about October 15, 2001, Internal Affairs issued a report based on interviews of Ms. Simpson, Officers Alenckis, O'Leary, Deal, and other

12

investigating Detectives. *See* Waterbury Police Department Internal Affairs Report [doc. # 35], Ex. G.  Among other things, the report stated that, "[b]ased on a review of the statements, warrant affidavits and interviews with the involved Officers it is apparent that proper Police procedures were followed."  *Id.* at 3.

Ms. Simpson does not specify what conduct by Superintendent Flaherty was allegedly inappropriate, much less unlawful.  While Ms. Simpson may not like the results of the Internal Affairs' investigation, that is hardly a basis for a constitutional claim and it is certainly not a basis for attributing unconstitutional conduct to the Superintendent.  Since no reasonable trier of fact could conclude that Superintendent Flaherty was personally involved in any of the constitutional violations alleged in the complaint, the Court grants summary judgment to Superintendent Flaherty on all claims**.**

**IV.**

The remaining Defendants are Officers O'Leary and Balnis.  The sum total of their involvement in this matter is as follows: Officer O'Leary spoke to Ms. Simpson when she called the Waterbury Police Department to demand that Mr. Lissandrello be permitted to submit a statement in support of Ms. Simpson's complaint, and Officer Balnis submitted affidavits in support of arrest warrant applications for both Ms. Simpson and Ms. DeNardo.  *See* Balnis Affidavits [doc. #35], Ex. D.

**A.**

Ms. Simpson first claims that Officers O'Leary and Balnis violated her Fourth Amendment right by falsely arresting her and maliciously prosecuting her.  The Court directs the parties to its ruling in *Szekeres v. Schaeffer*, No. 3:01CV2108 (MRK), 2004 WL 722240, at *5-

13

*10 (D. Conn. Mar. 26, 2004), setting forth the law governing false arrest and malicious

prosecution.  The Court rejects both claims for several reasons.

First, Ms. Simpson has not pleaded facts asserting or even suggesting that either Officer

O'Leary or Officer Balnis improperly arrested her or wrongfully procured her arrest, and

therefore she cannot maintain a false arrest claim against them.  While the police department

submitted arrest warrant applications to the State's Attorney – as both Ms. DeNardo and Ms.

Simpson had requested – it was the State's Attorney's Office that reviewed and signed those

applications and it was a Superior Court judge who ultimately approved of the arrests.

Moreover, Ms. Simpson has effectively conceded that none of the officers named as defendants,

including Officers O'Leary and Balnis, arrested or processed Ms. Simpson when she arrived at

the station following the issuance of the arrest warrant.  *See* Simpson Depo. at 114.

Second, even assuming *arguendo* that Officers O'Leary and/or Balnis was involved in

arresting Ms. Simpson, the Court finds that the officers had probable cause for her arrest.  Under

Conn. Gen. Stat. § 53a-181(a), a person is guilty of breach of peace when, "with intent to cause

inconvenience, annoyance or alarm, or recklessly creating a risk thereof," she: (1) [e]ngages in

fighting or violent, tumultuous or threatening behavior in a public place; or . . . (5) in public

place, uses abusive or obscene language or makes an obscene gesture.  Conn. Gen. Stat. § 53a-

181(a).  Ms. DeNardo submitted an affidavit in support of the arrest warrants for Ms. Simpson, in

which Ms. DeNardo stated the following:

> At the time, and for the past several years, I have been handicapped with multiple
> sclerosis, and I am presently in possession of a State of Connecticut Handicap
> Parking Permit.  When I got to the Mall I drove around looking for a handicap
> parking spot but here were none available.  I did see the area which is marked off
> with white lines in the handicap area and because I was only going to be in the

14

mall for no more than 10 minutes I parked my car in the white lined area.  My
grand-daughter and I got out of my car and began walking towards the Mall.  We
were in the crosswalk walking towards the entrance to Penny's Department Store
where all of a sudden this bluish green car cut right in front of us, almost hitting
us.  The female driver of the car rolled her window down and started yelling at me
. . . She continued yelling, but then started telling me to "move my fucking car
right now" after I told her I would only be a few minutes.  I explained to this
woman, who by this time was screaming hysterically, causing my grand-daughter
to get scared and begin crying . . . This woman then started threatening to have my
car towed . . . I tried to explain to my grand-daughter this woman was only fooling
and this was when I walked over to the woman's car, I did reach inside the car and
touched the woman's face, telling her, with a smile on my face, trying to calm my
grand-daughter down, to please tell my grand-daughter you were only fooling.
This was when the woman grabbed my hand, scratched it, and started screaming
and swearing I was crazy, which again made my grand-daughter get upset,
especially when my grand-daughter saw the marks on my hand from this woman.

*See* DeNardo Statement to Police [doc. # 35], Ex. C.  Based on Ms. DeNardo's statement, Officer

Balnis stated in his affidavit that he "believes that probable cause has been established to request

that an arrest warrant be granted for Chera Simpson . . . charging her with Breach of Peace in

violation of Connecticut General Statute 53a-181."  *See* Balnis Affidavit.  Ms. Simpson presents

no evidence that Officers O'Leary or Balnis fabricated or omitted material information in

connection with the warrant application for her arrest for breach of peace.  Rather, she simply

contests Ms. DeNardo's version of the facts.  Simpson Depo. at 78-82.

"'[I]t is well-established that a law enforcement official has probable cause to arrest if he

received his information from some person, normally the putative victim or eyewitness, who it

seems reasonable to believe is telling the truth.'"  *Caldarola v. Calabrese*, 298 F.3d 156, 163 (2d

Cir. 2002) (quoting *Miloslavsky v. AES Eng'g Soc'y*, 808 F. Supp. 351, 355 (S.D.N.Y. 1992)); *see*

*Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) ("When information is received from

a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as

to the person's veracity.") (citations omitted).[5]  In this case, Officer Balnis's belief that probable cause existed was confirmed by the State's Attorneys Office and a Superior Court judge, when he issued the arrest warrants.  In these circumstances, no reasonable jury could deny that probable cause existed to arrest Ms. Simpson for breach of peace based on the information available to the Waterbury police at the time Ms. Simpson was arrested and processed.  *See Jocks v. Tavernier,* 316 F.3d 128, 135 (2d Cir. 2003) ("Probable cause to arrest should be determined based on what the officer knew at the time of the arrest.") (citing *Ricciuti v. N.Y.C. Transit. Auth.,* 124 F.3d 123 (2d Cir. 1997); *see also U.S. v. McFadden*, 238 F.3d 198, 204 (2d Cir. 2001) ("If the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed, probable cause to arrest exists.") (citation and quotation marks omitted).

Third, even if the Court were in error in concluding that probable cause existed to arrest Ms. Simpson for breach of peace based on Ms. DeNardo's statement, the Waterford Police officers certainly had "arguable probable cause" to arrest Ms. Simpson.  *See Escalera v. Lunn*, 361 F.3d 737, 744 (2d Cir. 2004).  "If police officers of reasonable competence could disagree as to whether there was probable cause, there is 'arguable probable cause' sufficient to warrant qualified immunity for the defendant officers."  *Boyd v. New York*, 336 F.3d 72, 76 (2d Cir. 2003).  In this case, there is no question that a reasonable trier of fact, upon the undisputed facts, would find that police officers of reasonable competence could disagree as to whether there was

---

[5] Even Ms. Simpson's complaint regarding the alleged omission of Mr. Lissandrello's statement is without effect since, as Ms. Simpson concedes, his statement was accepted by Waterbury police.  Simpson Depo. at 83

probable cause to arrest Ms. Simpson.  Indeed, in the face of the Superior Court's approval of the arrest warrants, a reasonable juror could not reach any other conclusion.  Officers O'Leary and Balnis are therefore entitled to qualified immunity from Ms. Simpson's false arrest claim.

For the foregoing reasons, the Court grants Officers O'Leary and Balnis summary judgment on the § 1983 claim for false arrest.

### B.

Ms. Simpson next asserts a Fourth Amendment claim for malicious prosecution against Officers O'Leary and Balnis.  "In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and establish the elements of a malicious prosecution claim under state law." *Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002).  While § 1983 affords plaintiffs a federal cause of action, courts generally "borrow the elements of the underlying malicious prosecution from state law." *Washington*, 373 F.3d at 315.  To sustain a malicious prosecution claim under Connecticut law, a plaintiff must prove the following elements:

> (1) the defendants initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice.

*Lo Sacco v. Young*, 20 Conn. App. 6, 19-20 (Conn. App. Ct. 1989) *cert. denied*, 213 Conn. 808 (1989) (citing *McHale*, 187 Conn. at 447); *see also Boyd*, 336 F.3d at 76; *Singer*, 63 F.3d at 116-17.  The Court does not believe that Ms. Simpson can satisfy any of the elements stated above. For purposes of this opinion, however, it is necessary only to discuss two of the elements.

First, Ms. Simpson has not presented evidence to satisfy the initial prong of a malicious

17

prosecution claim – that either Officer O'Leary or Balnis initiated or procured criminal proceedings against Ms. Simpson. As the Seventh Circuit observed in *Snodderly v. R.U.F.F. Drug Enforcement Task Force*, 239 F.3d 892, 901 (7th Cir. 2001), in language that aptly applies to this case as well, "a malicious prosecution action against a police officer is 'anomalous,' because the State's Attorney, not the police, prosecutes a criminal action. Absent a claim that [the officers] played more of an essential or influential role in seeking or procuring the . . . indictment, [plaintiffs'] bare-bones assertions against them are insufficient to state a claim for malicious prosecution." *Id.* (quoting *Albright v. Oliver*, 510 U.S. 266, 279 n. 5 (1994) (Ginsburg, J., concurring) (citation and quotation marks omitted). While Ms. Simpson contends that "defendant DeNardo submitted a blatantly false affidavit at the urging and with the connivance of the defendants O'Leary and Balnis," and that they "then exacerbated the situation by concealing material facts which would have demonstrated the falsity of the DeNardo affidavit," Mem. in Opp'n to Mots. for Summ. J. at 22, the record before the Court is utterly devoid of facts to support Ms. Simpson's allegations. There is simply no basis upon which to find that Officer O'Leary or Balnis exerted influence or pressure, submitted knowing misstatements to the prosecutor, or concealed exculpatory evidence. *Reed v. City of Chicago*, 77 F.3d 1049, 1053-54 (7th Cir. 1996). Ms. Simpson does not identify what, if any, "material facts" were allegedly omitted in Officer Balnis' affidavit in support of an arrest warrant for Ms. Simpson. Moreover, even if Ms. DeNardo provided untruthful information in her statement to the police, Officer Balnis at worst merely acted as a conduit through which Ms. DeNardo's statement was submitted to the State's Attorney's Office, and that falls far short of satisfying the first element of a malicious prosecution claim.

18

Second, a plaintiff must demonstrate that a criminal proceeding terminated in her favor in order to sustain a malicious prosecution claim. *See Singleton v. City of New York*, 632 F.2d 185, 194-95 (2d Cir. 1980); *see also Pinaud v. County of Suffolk*, 52 F.3d 1139, 1154 (2d Cir. 1995); *Roesch v. Otarola*, 980 F.2d 850 (2d Cir. 1992); *Walsh v. Sousa*, No. 3:01CV1872 (JCH), 2004 WL 717169, at *4 (D. Conn. Mar. 25, 2004). It is undisputed that the Assistant State's Attorney nolled the charges against both Ms. Simpson and Ms. DeNardo when they appeared before Judge Damiani. *See* Superior Court Transcript [doc. # 35], Ex. F, at 2-3.[6] A *nolle prosequi* does not qualify as a favorable termination for purposes of a malicious prosecution claim. "Connecticut case law explicitly defines a nolle as 'a unilateral act by a prosecutor, which ends the pending proceedings without an acquittal and without placing the defendant in jeopardy,' in contrast to a dismissal, which 'is an act of court'" *Walsh*, 2004 WL 717169, at *4 ; *see also Cislo v. City of Shelton*, 240 Conn. 590, 599 n. 9 (Conn. 1997). Moreover, a criminal defendant has the right to object to a nolle and to demand a trial or dismissal. *See* Conn. Gen.Stat. § 54-56b. At least with respect to malicious prosecution claims, "a person who thinks there is not even probable cause to believe he committed the crime with which he is charged must pursue the criminal case to an acquittal or an unqualified dismissal, or else waive his section 1983 claim." *Roesch v. Otarola*, 980 F.2d 850, 853 (2d Cir. 1992); *see Assegai v. Bloomfield Bd. of Educ.*, 308 F. Supp. 2d 65, 70

---

[6] Ms. Simpson alleges in her Complaint that "on or about September 10, 2001, []the false criminal charge against the plaintiff was dismissed by a Judge of the Superior Court." Compl. ¶ 18. The transcript of the September 10, 2001 proceedings, however, indicates not an entry of dismissal by the court. Rather, Assistant State's Attorney Klatt stated to the court: "I'm not going to waste the State's time prosecuting either case . . . We would either have to prosecute both or nolle both . . . If both individuals . . . were acting like adults and acting in an appropriate fashion, neither of them would have been arrested, and on that basis, I'm going to enter nolles on both." Superior Court Transcript at 3.

(D. Conn. 2004).  Since Ms. Simpson is unable to demonstrate that the criminal proceedings against her terminated in her favor, her malicious prosecution claim must fail.  The Court therefore grants Officers O'Leary and Balnis summary judgment on the § 1983 claim for malicious prosecution.

### C.  Equal Protection

Lastly, Ms. Simpson alleges that Officers O'Leary and Balnis denied her equal protection of the laws in violation of the Fourteenth Amendment.  The Court finds no basis in the record to support Ms. Simpson's equal protection claim.

"To succeed in an action alleging selective prosecution, plaintiffs in this Circuit have been required to show both (1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."  *Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004).[7]

Ms. Simpson alleges that she was subjected to humiliating treatment when she reported to the Waterbury Police headquarters following issuance of a warrant for her arrest.  Compl. ¶ 15. She alleges that she was "searched by a matron in full view of numerous male police officers and then placed in a holding cell where she was imprisoned for approximately two hours before being released on written promise to appear in court as an accused criminal."  *Id.*  Ms. Simpson insists

---

[7] As the Second Circuit noted in *Cobb*, there are two possible equal protection claims – for selective prosecution and for class of one, or *Olech*-based, equal protection claims.  *Cobb*, 363 F.3d at 109-10.  Ms. Simpson alleges only the former since nowhere in her pleadings does she argue that she was treated differently from similarly situated individuals *and* that there was "no rational basis for the difference in treatment."  *Id.* at 110.

that Ms. DeNardo did not receive such "degrading and abusive treatment," and attributes the difference to malice on the part of Waterbury Police officers. *Id.* The only other basis Ms. Simpson suggests reflected malice by any of the Defendants is the result of the Internal Affairs investigation that stated "your complaint cannot be substantiated, [t]herefore no further action will be taken." Compl. ¶ 16, 20.

Ms. Simpson's assertions do not rise to the level of a constitutional claim against Officers O'Leary and Balnis. She does not identify either Officer O'Leary or Officer Balnis as having had anything to do with her allegations regarding the body search at police headquarters or the conduct of the Internal Affairs investigation. Furthermore, aside from her conclusory allegations of malice, Ms. Simpson has not provided the Court with any evidence to show that she was treated differently from similarly situated individuals or that the conduct of which she complains was malicious or in bad faith. *See Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002) (noting that "reliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion); *Cary v. Crescenzi,* 923 F.2d 18, 21 (2d Cir. 1991) (nonmovant's "bald assertion, completely unsupported by evidence," did not satisfy burden in opposing motion for summary judgment). Therefore, the Court concludes that, even construing the alleged facts in the light most favorable to Ms. Simpson, Officers O'Leary and Balnis are entitled to judgment as a matter of law on her equal protection claim.

## V. Conclusion

For the foregoing reasons, the Court GRANTS both the Police Officers' Motion for Summary Judgment [doc. #33] and Defendants DeNardo's Motion for Summary Judgment [doc. #36]. The Clerk is directed to close this case.

21

IT IS SO ORDERED.


/s/ _____Mark R. Kravitz_____
United States District Judge


Dated at New Haven, Connecticut: <u>July 29, 2004</u>.